# Wytheville.

## THE TEXAS COMPANY, INC. v. FREDERICK NORTHUP.

June 12, 1930.

Absent, Campbell and Holt, JJ.

The opinion states the case.

*F. M. Chichester*, for the appellant.

*R. O. Norris, Jr.*, and *W. T. Mayo*, for the appellee.

PRENTIS, C. J., delivered the opinion of the court.

The appellant, the Texas Company, Incorporated, complains of a decree overruling its demurrer to the bill filed against it by Frederick Northup, appellee; cancelling a lease from Northup to the company, dated March 12, 1927, and perpetuating an injunction against the appellant restraining it from occupying or interfering with the premises described in the lease—certain wharf property at Sharps, Virginia, in the county of Richmond—but permitting the company to remove its equipment from the premises within sixty days.

This is a general statement of the facts upon which the appellee relies to support the decree:—

He had, on December 31, 1921, purchased the property of Milden Packing Company, at Sharps, Virginia, on which the wharf was located, and on which a bulk station for the landing and storing of gasoline and oil products from boats on the Rappahannock river had been erected. There had been a previous lease to the company for five years which had expired prior to Northup's purchase, but thereafter until the signing of the lease here involved, the former lease had been renewed from year to year by Northup, owner, who, from the date of his purchase until this controversy arose, had also been the sole distributor of the Texas Company's gasoline and other petroleum products in the adjacent territory. These were sold to Northup delivered in equal quantities monthly in accordance with the terms of the written sales agreement, and placed in tanks erected by the company on the leased property. This leased wharf property had been under another simultaneous agreement in writing, called the license, left in Northup's possession, for which Northup was required to pay a monthly rental equal to the legal interest on the equipment placed there by the Texas Company. The property was maintained by Northup at an annual cost of repairs, insurance and taxes, at approximately $1,000.00 per year. Northup had, through the years, built up a large business in the conduct of which he had invested about $125,000.00 in tank wagons, filling stations, leases, and other equipment, and he required about 100,000 gallons of the company's products per month in order to supply his customers.

It became necessary on March 1, 1927, to enter into a new sales agreement. Thereupon a new sales agreement was presented to Northup for his signature at the same time with a new lease of the wharf property to the

company, together with the license agreement from the company permitting Northup to occupy the wharf property and use the equipment placed thereon by the company. They were prepared in the office of the company in New York, each complete documents, but they bore different dates. The sales agreement is dated March 1, 1927, the lease is dated March 12, 1927, and the license is dated February 15, 1927. Each was thereafter executed by Northup on March 12, 1927, but the lease was not to become effective until March 24, 1927. It is observed that the license agreement from the company to Northup and the lease from Northup to the company specifically relate to the same property, defined as beginning "at a point in the northerly side of the pier head of Sharps wharf, so called," and otherwise described in identical words. It is also observed that the sales contract refers to Sharps, Virginia, as a distribution point and that Northup, in that contract, agrees to keep all equipment used in storing and/or distributing Texaco products in good repair and neat appearance satisfactory to the seller. The license contract also refers directly to the sales contract in this language: "Licensor hereby reserves the right at any time to cancel and terminate this license forthwith in event of the termination or failure of consummation of a certain sales contract now in force or being negotiated between the parties hereto," etc.

It seems, therefore, quite apparent, without the necessity of referring to the parol evidence, and solely from a reading of these three nominally separate contracts, that they are parts of a single agreement for the purchase and distribution by Northup of Texas Company's products at Sharps, Virginia—a joint enterprise.

The sales contract is for one year and is thereafter subject to cancellation by either party upon thirty days'

notice of intention to do so; while the other two, the lease and the license contracts, are for five years, subject to termination by the Texas Company. Northup had been informed by the sales manager of the company in his territory that there had been a change in the personnel and policy at the home office of the Texas Company; that other similar contracts of distributors had been cancelled, and that his contract might be cancelled at any time. Upon its face the lease reserved an annual rent of $25.00 to Northup, was for a term of five years, with the right reserved to the Texas Company after one year to terminate it on thirty days' notice, with no such right reserved to Northup. He was informed that the sales contract would not be entered into by the company unless he signed both of the other contracts precisely as they had been prepared.

He shows that he realized that his supply of gasoline and oils would soon be exhausted, and that if he failed to receive his anticipated supply at the end of the month his business would suffer greatly. Before signing the lease, however, and because of this threatened destruction of his business, he went to the city of Norfolk, Virginia, and consulted the company's district sales manager, Mr. Thompson, who assured him that it was apparent that the true consideration for the lease was the sales agreement, and that it would be inconsistent to assume that the Texas Company would desire to continue to hold the wharf property after the sales agreement had been terminated. And he shows that it was then and there verbally agreed that Northup was to have the sole distribution of the Texas Company's products in the territory, and he sought to show that he should also have the right to terminate the lease when the sales agreement was terminated. He shows that he signed the lease under this condition and upon this

assurance on March 12, and received the three documents from the company a few days after March 25, 1927. The sales agreement thereupon became binding upon both parties for one year from the date of March 1, 1927, and thereafter until terminated by thirty days' notice.

The company, on July 30, 1928, gave notice to Northup cancelling the sales contract and the license, but made no reference then to the lease. Whereupon Northup sent the company notice cancelling the lease and received in reply from the attorney of the company a letter denying his right to do so, the reason therefor being thus expressed: "The lease itself constitutes a complete agreement based on a valid consideration, and is not subject to cancellation by reason of the termination of an entirely separate and distinct contract."

The question presented for determination here is whether the Texas Company has the right to continue to occupy the premises owned by Northup· at Sharps wharf as his lessee for the unexpired term of the lease, notwithstanding the fact that it has cancelled the contemporaneous sales agreement and the license contract. The trial court, as has been stated, held that the company had no such right and cancelled the lease.

The bill of the appellee alleges fraud in the procurement of the lease and failure of consideration therefor, and that the company is seeking to obtain an unconscionable advantage which the court of equity should restrain. The bill, among other things, alleges: "That in terminating the contract NFK-X-350, dated March 1, 1927, the Texas Company has violated its verbal agreement with your complainant by which he was to have exclusive distribution of Texas products, to-wit, in all of the Northern Neck of Virginia from the Rappahannock river to the Potomac river and running from

the north side of the Corrotoman river in Lancaster county to Comorn in King George county, and from the north side of the Coan river in Northumberland county to Comorn aforesaid, the district in which he has heretofore distributed Texas products; that the said Texas Company has entered into a contract with another party to distribute its products within the district aforesaid; that said Texas Company now proposes to take possession of your complainant's bulk station and storage property at Sharps aforesaid on the 30th day of August, 1928, at twelve o'clock midnight, and to use same as a storage and bulk station for its products which will be distributed by a competitor of your complainant as your complainant, by reason of the termination of this contract with the Texas Company, has been compelled to arrange for the distribution of similar products of a company in competition with the said Texas Company; that the said Texas Company has worked a fraud upon your complainant in the obtaining of said lease and is guilty of fraud, misrepresentation and duress in the procuring of same; that said lease is inequitable, unjust and unfair, and that the consideration for said lease has failed; that your complainant will be compelled to deliver said bulk station and storage station at Sharps, Virginia, to the said Texas Company on August 30, 1928, at twelve o'clock midnight, unless said Texas Company is enjoined and restrained from entering upon said premises; that your complainant has no adequate remedy at law, as his business will be seriously injured and damaged if he is forced to deliver up said storage station at Sharps, Virginia, as he will be prevented from making deliveries to his customers, which damage cannot be arrived at in dollars and cents; that your complainant will suffer irreparable damage unless said injunction is granted; that your complainant has built up

a large and lucrative business through years of intense application and energy and has a large amount of capital invested in said business and that if said business is ruined or seriously injured, it would mean the loss of his lifetime accmulation òr a large part thereof."

It is contended for the company that the lease dated March 12, 1927, which the appellee claims the right to have cancelled by the court on the ground of fraud, is a complete contract on its face, and that the charge of fraud in the bill is not sufficient to permit the introduction of parol testimony set out in the bill to vary the terms of the contract, and that therefore the demurrer of the petitioner should have been sustained; that the answer of the petitioner is a complete and full denial of the allegations of the bill, and that upon the submission of the cause on the bill, demurrer, answer, and affidavits, the injunction should have been dissolved and the bill dismissed.

The initial as well as the decisive question in the case then is, whether or not the lease for five years is to be construed as a separate and complete contract which cannot be affected by parol testimony, and whether the rights of the parties thereunder solely depend upon the construction of its precise language without any consideration either of the parol testimony showing the circumstances under which it was executed or of the other contemporaneous written contracts, *i. e.*, the sales contract and the license agreement executed at the same time.

Only because of the earnestness and insistence of counsel do we deem it appropriate to make these citations which clearly demonstrate the sound rules which determine this question against the company.

In 6 Ruling Case Law, section 240, page 850, we find this comprehensive and clear statement: "When

different instruments are executed at the same time, but are all parts of one transaction, it is the duty of the court to suppose such a priority in the execution of them as shall best effect the intention of the parties. Moreover, the general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance."

One general rule relied upon for the appellant company is that parol evidence is not admissible to connect writings and that "in general the memorandum or agreement must contain either in itself or by clear reference all the terms of a complete contract, and that if any essential term is absent it is insufficient and cannot be cured by parol evidence," 15th English Ruling Cases, 358, *note*; 26th Ruling Case Law, section 318, page 680.

There is, however, a qualification of this rule which is well settled, namely, that such reference in one paper to another need not be explicit, but that it is sufficient if it is fairly traceable.

In *Beckwith* v. *Talbot*, 95 U. S. 289, 24 L. Ed. 496, there was a letter referring simply to "the agreement" and this was held a sufficient reference to a written agreement signed by the other party alone. It is there said, referring to the rule excluding parol evidence to connect such writings: "But the rule is not absolute. There may be cases where it would be a violation of reason and common sense to ignore a reference which derives its significance from such proof."

In *White* v. *Breen*, 106 Ala. 159, 19 So. 59, 32 L. R. A. 127, there is this clear statement, which has often been

quoted and approved, which is apposite in this case: "We are of the opinion that when all the writings adduced, viewed together, in the light of the situation and circumstances of the parties at the time they were written, show unmistakably that they relate to the same matter and constitute several parts of one connected transaction, so that the mind can come to no other reasonable conclusion, from the evidence so offered, than that they were each written with reference to those concurrent or preceding, then there is such a reference of the one to the other as satisfies the rule, although reference in express terms does not appear. The rule is one founded on reason; and when, as practical men, we look at the writings, and see, inhering in them, evidence which entirely satisfies the mind that they all relate to one general transaction, there is no reason why they should not be so considered. There is, in such case, a direct reference of the one to the other, within the meaning of the law." *Flegal* v. *Dowling*, 54 Ore. 40, 102 Pac. 178, 135 Am. St. Rep. 812, 19 Ann. Cas. 1159, refers to the same exception as obtaining generally in the construction of written contracts.

There is quite a collection of cases and a logical discussion of this question in *Searles* v. *Gonzalez*, 191 Calif. 426, 216 Pac. 1003, 28 A. L. R. 81, where this is stated: "While the memorandum must express the essential elements of the contract with a reasonable certainty, this may be gathered either from the terms of the memorandum itself or from some other paper or papers therein referred to. If one of a series of papers which appear to have some relation to the same matter is signed by the party to be charged, this is enough, as all the papers are to be considered together as forming one contract or memorandum. There is no doubt also that parol evidence is admissible to identify any paper referred to.

*Freeland* v. *Ritz,* 154 Mass. 257, 259, 12 L. R. A. 561, 26 Am. St. Rep. 244, 28 N. E. 226. Any rule to the contrary is not now conceded to be absolute. There may be instances in which it would be a violation of reason and common sense to ignore a reference which derives its significance from parol proof, *Beckwith* v. *Talbot*, 95 U. S. 289, 292, 24 L. Ed. 496, 498. In such cases parol evidence of contemporaneous facts and of the circumstances in which the parties were when the writings were signed, will be received to show their connection."

The case of *Nickerson* v. *Weld*, 204 Mass. 346, 90 N. E. 589, 591, well illustrates this: "The old rule, by which no other paper could be used to help out the memorandum unless incorporated into it by reference to the memorandum itself, * * * * is no longer followed. The connection between different papers, so that they may be considered together and their sufficiency be determined by the contents of all of them, may be proved by oral evidence; at least, so far as it is the result of that evidence to establish the fact that all of the different papers which are so to be considered together are brought to the attention of both parties, and were linked together in their minds, so that the parties themselves may be found to have adopted all the papers as the expression of their purpose. This is the effect of the recent cases." "The relation of papers to each other must appear upon their face, but this relation may appear in either of two ways; by express references, or from the very nature of the contracts," *Swallow* v. *Strong*, 83 Minn. 92, 85 N. W. 942. This accords with the law in Virginia, for where two papers are executed at the same time between the same parties with reference to the same subject matter they must be regarded as parts of one transaction and receive the same construction as if their several provisions were in one and

the same instrument. *Portsmouth Refining Corp.* v. *Oliver Refining Co.*, 109 Va. 520, 64 S. E. 56, 132 Am. St. Rep. 924.

In the case of *Ford* v. *Norton*, (1927), 32 N. M. 518, 260 Pac. 411, 55 A. L. R. 261, involving the lease of a gasoline filling station and a sales contract, this is held: "Where, as a controlling consideration for a lease of a filling station, the lessee consented, in addition to payment for rent, to purchase gas exclusively from the lessor, the latter covenanting to supply it at current market prices, a rescission of the lessee's covenant to buy because of a breach of the lessor's covenant, leaving the lease otherwise in force, is inequitable, the contract not being so separable as to permit a partial rescission." The discussion on this point is closed thus: "The other duties assumed by appellees were obligations which appellant was himself required to perform by the terms of of his own lease. The plain purpose of the whole transaction was to procure for appellant, during a long term of years, an outlet and assured market for the goods he had for sale. Otherwise there was no profit for him in the transaction, and he simply incurred responsibility without compensation. The judgment results in leaving the appellees in possession of all the benefits and relieved of the substantial obligation. It wipes out the controlling consideration following to appellant and results in a forfeiture of his property. Practically speaking, the appellant is in far worse situation than if the court had awarded appellees that which they did not ask and here contend they were not entitled to—a rescission in *toto*. The latter would have been comparatively harmless, because appellant would then have had restored to him the possession of the demised premises, and might have found others to contract with him and to assume the obligation from which appellees have

been relieved. It is clear to us that the present result is inequitable, and that the affirmative relief awarded to the appellees cannot be sustained.''

It seems to us then manifest that for the purpose of determining the rights of the parties under this lease and the relief to be accorded under the pleadings and proofs in this case, all three documents, the sales contract, the license agreement and the lease, must be considered together as the written evidence of an entire contract for the promotion of the common purpose, that is, the sale and distribution by Northup of the products of the Texas Company, for mutual profit and advantage. The various provisions of these contracts should not be so construed as to leave appellant company in possession of the leased property, the wharf, at a nominal rent after it has exercised its rights to terminate the sales and the license agreement. What then is the relief to which the appellee is entitled?

That the substantial failure of consideration for a contract may justify its rescission under certain circumstances can hardly be doubted, *Kessler* v. *Parelius*, 107 Minn. 224, 119 N. W. 1069, 131 Am. St. Rep. 459, 6 R. C. L., section 39, page 925.

It is said in 4th R. C. L., section 14, page 500, that while mere failure of consideration, partial or total, without fraud or bad faith is not sufficient to justify a court of equity in rescinding an executed contract, it is nevertheless noted ''that failure of consideration is, as a rule, not a ground for equitable relief or interference, nevertheless where a person has been induced to part with a thing of value for little or no consideration, chancery will seize upon the slightest circumstances of oppression, fraud or duress for the purpose of administering justice in the case in hand.'' Citing *Kronmeyer* v. *Buck*, 258 Ill. 586, 101 N. E. 935, 45 L. R. A. (N. S.) 1182.

"That a substantial failure of consideration is a well recognized ground for rescission of a contract and recovery of the money paid thereon can hardly be questioned," is said in *Pennok Oil Co.* v. *Roxana Petroleum Co.* (C. C. A.), 289 Fed. Rep. 420, 6 R. C. L., section 309, page 925, 24 Am. & Eng. Ency. of L. (2 ed.) 644; *Larson* v. *Thomas*, 51 S. D. 570, 215 N. W. 927, 57 A. L. R. 1246.

That there will be a total or substantial failure of consideration to the appellee here, should he be denied relief which he seeks, is manifest.

It has frequently been said, and this is not questioned, that an improvident contract, or one based upon inadequate consideration, will not be set aside for these reasons alone, unless, as the rule is generally stated, the improvidence or inadequacy is so great as to furnish of itself convincing evidence of fraud.

Judge Thompson, in *Nelson* v. *Betts*, 21 Mo. App. 231, said that "equity does not undertake to act as the guardian of mankind. It does not aid people who make foolish bargains."

There are many instances, however, in which such relief has been granted in which the consideration was shown to be so grossly inadequate as to show fraud.

Lord Thurlow said as to this: "An inequality so strong, gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it," is sufficient. *Gwynne* v. *Heaton*, 1 Bro. Ch. 1, 9; 28 Rep. 949.

In *Wintermute* v. *Snyder*, 3 N. J. Eq., 496, Chancellor Vroom said: "Still there may be such unconscionableness, such palpable and excessive inequality in a bargain as to induce equitable interference.

But in all such cases the court goes on the ground of fraud, being satisfied that gross imposition or undue influence must have been practiced. If the inadequacy be such as to shock the conscience, it will amount to evidence of fraud and will be so considered."

In *Osgood* v. *Franklin*, 2 Johns. Chy. (N. Y.) 24, 7 Am. Dec. 513, Chancellor Kent said: "The doctrine is settled that in setting aside contracts on account of inadequacy of consideration, the ground is fraud arising from gross inequality."

Judge Story says that "Such inadequacy should be made out as would (to use an expressive phrase) shock the conscience and amount in itself to conclusive and decisive evidence of fraud." Story's Eq. Jur., page 256.

Lord Hardwick in *Chesterfield* v. *Janssen*, 2 Ves. 155, 23 Rep. 82, 18 E. R. C. 289, states the test to be: "Such (bargains) as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." 9 C. J. 1175.

The conclusion here is irresistible for equity considers substance rather than shadow; reality rather than form.

If the company, in originally presenting and insisting upon the execution of the lease, then intended it to be construed as separate and severable without any reference to the circumstances and inducements under which it was executed, and if the purpose of so drawing the lease was to enable it to cancel the sales and license contract without cancelling the lease, and so to retain the wharf property owned by the appellee for the nominal rent of $25.00 a year while the appellee owner was at the same time obliged to pay the taxes upon the property and otherwise to maintain it, then this, under the circumstances, was duress and actual fraud in the procurement of the lease, which justifies

its rescission. If this actual fraudulent intent was not then conceived, and the purpose to take such an unconscionable advantage of the appellee was an afterthought, then this is constructive fraud, the insistence upon an unconscionable bargain which the court of equity will not sanction. This contract (and by contract we mean that which as a whole is evidenced by the three documents so frequently referred to) cannot be partially terminated by the company so as to take to itself all of the substantial benefits of the lease and at the same time to repudiate all of its own obligations to the appellee under the inseparable sales and license agreements. This repudiation by the company is so substantial and fundamental as to defeat the object of the lease. The arm of equity is long enough to afford adequate remedy to the appellee. The decree of the trial court is without error and will be affirmed.

*Affirmed.*