Present:  All the Justices

COUNTRYSIDE ORTHOPAEDICS, P.C., ET AL.

v. Record No. 000558

RANDALL S. PEYTON                              OPINION BY
                                        JUSTICE CYNTHIA D. KINSER
                                            January 12, 2001
RANDALL S. PEYTON

v. Record No. 000572

COUNTRYSIDE ORTHOPAEDICS, P.C., ET AL.

            FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                    James H. Chamblin, Judge


     In these two appeals, the first question we address is

whether four agreements executed as part of a single

transaction to accomplish an agreed purpose should be

construed together even though all the agreements were not

executed by the same parties.  The second question is

whether a doctor, who was a party to three of the

agreements, can enforce a provision providing for severance

pay.  Because we conclude that the agreements should be

construed as one instrument and that the doctor now

claiming severance pay was the first party to commit a

material breach, we will reverse that part of the circuit

court's judgment awarding severance pay to that doctor.

However, we will affirm that portion of the court's

judgment with regard to the doctor's base compensation.

FACTS AND MATERIAL PROCEEDINGS

Raymond Francis Lower, D.O., F.A.A.O.S., an orthopaedic surgeon, formed Countryside Orthopaedics, P.C. (Countryside), in 1993. Dr. Lower was Countryside's sole officer, director, and shareholder until 1997. As of January 1, 1997, Randall Sutton Peyton, M.D., also an orthopaedic surgeon, became a 50 percent shareholder in Countryside.

Dr. Peyton first started working for Countryside in 1995 as an employee physician. The terms of the employment contract between Dr. Peyton and Countryside at that time granted Dr. Peyton, <u>inter alia</u>, the right to purchase 50 percent of the stock in Countryside if Dr. Peyton met a certain level of productivity based on his billings. Dr. Peyton satisfied the billing threshold during his first year of employment, so he and Dr. Lower began negotiations late in 1996 to effect the purchase of stock by Dr. Peyton and to agree upon the terms of the documents needed to accomplish that purpose. Those negotiations culminated with the execution of the following four agreements in June 1997, to be effective retroactively to January 1, 1997:

I.   "Stock Purchase Agreement" between Dr. Peyton and Dr. Lower;

II.  "Employment Agreement" between Countryside and Dr. Peyton;

III. "Employment Agreement" between Countryside and Dr. Lower; and

IV. "Stockholders' Agreement" between Dr. Lower, Dr. Peyton, and Countryside.

The purpose of the Stock Purchase Agreement was to enable Dr. Peyton to purchase from Dr. Lower 50 shares of the 100 shares of the issued and outstanding common stock of Countryside. The purchase price for the 50 shares was $94,258, to be paid "unconditionally, with [Dr. Peyton] having no right of set-off against [Dr. Lower], in forty-eight (48) equal monthly payments beginning January 1, 1997." The terms of the Stock Purchase Agreement further required, in the event the closing occurred after January 1, 1997, that Dr. Peyton immediately bring the monthly payments current as of the closing date. Pursuant to the terms of this agreement, Dr. Peyton "irrevocably" authorized Countryside to withhold the required monthly payments from his salary and to pay that sum directly to Dr. Lower.

The terms of the two employment agreements were virtually identical. Each physician could terminate his employment with Countryside by mutual agreement or by giving ninety days written notice, and neither doctor was

3

restricted in his right to compete with Countryside after termination of his employment.[1]

Two provisions of Dr. Peyton's Employment Agreement are at issue in this case. The first one, found in paragraph 3(a), establishes his base entitlement to compensation and provides the following method of calculating that portion of his compensation:

> Base Entitlement. An Entitlement (salary, retirement plan contributions and Additional Benefits, as defined below) which will be the excess of his "Collections" (as defined below) over (i) his proportionate share (initially 50 percent) of the Corporation's "Fixed Expenses", plus (ii) 100 percent of his "Individual Expenses", plus (iii) 100 percent of his "Variable Expenses". "Fixed Expenses", "Individual Expenses" and "Variable Expenses" shall be defined by mutual agreement of the Corporation and the Physician and applied consistently from year to year.

The second provision pertains to Dr. Peyton's right to receive severance pay upon termination of his employment with Countryside. In pertinent part, that section of the Employment Agreement establishes the amount of severance pay, the time of payment, and a condition precedent to Countryside's obligation to make such a payment:

> 3. . . .
>
> (e) Severance Pay. In the event that the Physician dies or otherwise ceases his employment under this Agreement for any reason[,] . . . the

---

[1] Dr. Peyton's first employment contract with Countryside contained a restrictive covenant.

4

Corporation shall pay the Physician . . . severance pay ("Severance Pay") as follows:

     (1) Amount.  Severance Pay shall be an amount equal to eighty percent (80%) of his "Collections["] less the Physician's Individual Expenses remaining unpaid at the time the cessation of employment occurred reduced by any Excess Amount remaining unrepaid.

     (2) Payment.  The Severance Pay determined in accordance with Paragraph 3(e)(1) shall be paid no later than ninety (90) days after the cessation of employment occurred, and then every ninety (90) days thereafter.

     . . . .

     (4) Physician's Compliance.  The Physician's . . . full, timely, and continuing compliance in all material respects with every material term with this Agreement and of every other written agreement between the Physician and the Corporation in force after the effective date of termination is a condition precedent to the Corporation's obligation to pay Physician Severance Pay in accordance with this paragraph.

The Stockholders' Agreement established the internal operating structure of Countryside.  The only provision of that agreement at issue in this appeal concerns the requirement that a corporate decision to "[i]ncur any debt or issue any note in an aggregate principal amount exceeding [$5,000] in a single transaction" be approved by all the stockholders.

When the respective parties executed these four agreements in June 1997, Dr. Peyton, pursuant to the terms of the Stock Purchase Agreement, owed monthly payments to Dr. Lower for the months of January through June.  Dr.

5

Peyton did not, however, make those payments at closing, and Countryside never withheld the monthly payments from Dr. Peyton's salary. In fact, Dr. Peyton did not make any payments for his purchase of stock in Countryside until August 1997, when he paid Dr. Lower the sum of $13,745.97 out of the proceeds of a bonus that each doctor had received from Countryside in July. Dr. Peyton's stock purchase payment in August covered the past due payments for the months of January through July, and was the only payment that Dr. Peyton made for his purchase of stock in Countryside.

Subsequent to the closing, the relationship between Dr. Lower and Dr. Peyton deteriorated. One particular disagreement that arose concerned the question whether Dr. Peyton's payments pursuant to the Stock Purchase Agreement were to be made with pre-tax or post-tax dollars. According to Dr. Peyton, this problem and other concerns caused him to become dissatisfied with his relationship with both Dr. Lower and Countryside. Consequently, on October 3, 1997, Dr. Peyton tendered a letter terminating his employment with Countryside, to be effective as of December 31, 1997. Dr. Peyton then filed a suit against

Countryside and Dr. Lower.[2]  In his amended bill of complaint, Dr. Peyton asked for specific performance of his Employment Agreement with regard to the records and charts of patients he treated while at Countryside, an accounting of the payments that he alleged were due to him from Countryside pursuant to the terms of the Employment Agreement, damages for breach of his Employment Agreement by Countryside, and damages for breach of fiduciary duty by Countryside for allegedly depleting Dr. Peyton's accounts receivable and increasing the expenses charged to him.[3]  In response, Dr. Lower and Countryside, in an amended cross-bill of complaint, sought a declaratory judgment as to the rights of Countryside and Dr. Peyton under the Stockholders' Agreement, damages for Dr. Peyton's alleged breach of fiduciary duty, rescission of the June 1997 agreements due to Dr. Peyton's alleged breaches of contract, and damages for alleged fraud by Dr. Peyton in inducing Dr. Lower to enter into those agreements.

---

[2] Dr. Peyton originally named an additional party defendant but later dismissed that defendant without prejudice pursuant to a joint stipulation.

[3] The circuit court sustained a demurrer with regard to several other claims in Dr. Peyton's amended bill of complaint.

7

At the conclusion of a bench trial, the circuit court awarded judgment in favor of Dr. Lower on the claims asserted against him individually. The court also determined that the evidence did not support an award of punitive damages against Dr. Peyton. The court then took all other issues under advisement and subsequently issued a letter opinion. The following findings by the court are pertinent to the issues raised in this appeal:

I. Dr. Peyton's claims:

A. The court did not order an accounting by Countryside but did direct Countryside to comply with the Employment Agreement and to pay Dr. Peyton his severance pay.

B. The court granted judgment in favor of Dr. Peyton against Countryside in the amount of $140,634.23 for unpaid severance pay but concluded that Dr. Peyton was not entitled to any additional pay for 1997 because he had been overpaid for that year in the amount of $1,100.35.[4]

C. The court did not award any separate damages for breach of fiduciary duty but considered that in determining the damages owed to Dr. Peyton.

II. Countryside's claims:

A. The court found that Countryside had validly exercised its right to repurchase Dr. Peyton's stock

_____

[4] The court initially awarded Dr. Peyton severance pay in the amount of $333,282.85. The court then reconsidered it decision and, in a second letter opinion, reduced the amount to $140,634.23. That figure includes a deduction for the overpayment to Dr. Peyton in 1997 in the amount of $1,100.35. The court also determined that Dr. Peyton would be entitled to 80 percent of his accounts receivable collected by Countryside after January 1, 1999.

8

in the corporation pursuant to the Stockholders' Agreement.

B. The court concluded that Dr. Peyton had not breached any fiduciary duty to either Countryside or Dr. Lower.

C. The court denied the claim for rescission because it concluded that Dr. Peyton had not materially breached any of the 1997 agreements.

D. The court concluded that Dr. Peyton did not commit fraud and did not fraudulently induce Dr. Lower to enter into the agreements.

In determining the amount of Dr. Peyton's severance pay, the circuit court rejected Countryside's argument that Dr. Peyton was not entitled to any severance pay because he had not satisfied the condition precedent in the Employment Agreement, i.e., that Dr. Peyton comply "in all material respects with every material term" of the Employment Agreement and any other agreement in force between him and Countryside. The court concluded that, by its own terms, the condition precedent applies only to the Employment Agreement because it is the only agreement between Dr. Peyton and Countryside. Thus, the court held that Dr. Peyton's compliance with the terms of the Stock Purchase Agreement regarding his payments was not a condition precedent to Dr. Peyton's right to receive severance pay. The court stated, "[t]he parties are bound by the words they used, and not by some nebulous concept of a 'package'

9

as argued by the Defendants." The court then entered a final decree in accordance with its letter opinions.

This Court awarded cross-appeals. In his first three assignments of error, Dr. Peyton challenges the circuit court's calculation of his severance pay. His remaining two assignments of error address the court's computation of his base entitlement for 1997. In Countryside's only assignment of error, it asserts that "the circuit court erred by ruling that Dr. Peyton was entitled to recover severance pay when Dr. Peyton failed to make the buy-in payments required as a material term of his agreements with Countryside and Dr. Lower." We will first address Countryside's assignment of error because our resolution of that issue affects the disposition of Dr. Peyton's assignments of error challenging the amount of his severance pay.

ANALYSIS

I. Countryside's Appeal

Countryside argues that the four agreements executed in June 1997 should be construed as a "package" or as parts of a single transaction. Countryside asserts that, when the agreements are viewed in that manner, the condition precedent contained in paragraph 3(e)(4) of the Employment Agreement requiring Dr. Peyton to be in compliance with

10

every material term is not limited to the terms of the Employment Agreement but includes his obligation to pay for his purchase of stock in a timely fashion. Thus, Countryside contends that Dr. Peyton is not entitled to receive any severance pay not only because he failed to comply with that condition precedent but also because he committed the first material breach of the terms of the agreements.

In response to Countryside's argument, Dr. Peyton rejects the theory that the four agreements should be viewed as a "package" and advances four reasons why he has not forfeited his right to receive severance pay. First, he claims that, even if his nonpayment of the stock purchase installments constituted a breach of the Employment Agreement, Countryside was not damaged. According to Dr. Peyton, this is so because Countryside was required under the Stockholders' Agreement to buy back Dr. Peyton's stock in Countryside upon his termination of employment. Next, Dr. Peyton contends that Countryside is estopped from claiming any breach relating to Dr. Peyton's failure to make the stock purchase payments because Dr. Lower allegedly "agreed to wait" on Dr. Peyton's payments until the dispute concerning whether those payments were to be made with pre-tax or post-tax dollars could be resolved.

11

Third, Dr. Peyton contends that, since the Stock Purchase Agreement was not between Countryside and Dr. Peyton, compliance with that agreement was not a condition precedent to Countryside's obligation under the Employment Agreement to pay Dr. Peyton severance pay. Finally, Dr. Peyton argues that the Stock Purchase Agreement was not an agreement in force after the effective date of his termination from employment and thus was not subject to the condition precedent contained in paragraph 3(e)(4) of the Employment Agreement.

The first step in analyzing this issue is to determine whether the four agreements executed in June 1997 should be construed together as one instrument or contract. This Court has repeatedly stated that "[w]here two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." Oliver Refining Co. v. Portsmouth Cotton Oil Refining Corp., 109 Va. 513, 520, 64 S.E. 56, 59 (1909); accord First Am. Bank of Va. v. J.S.C. Concrete Constr., Inc., 259 Va. 60, 67, 523 S.E.2d 496, 500 (2000); Daugherty v. Diment, 238 Va. 520, 524, 385 S.E.2d 572, 574 (1989); J.M. Turner & Co. v. Delaney, 211 Va. 168,

12

171-72, 176 S.E.2d 422, 425 (1970); <u>Bolling v. Hawthorne Coal & Coke Co.</u>, 197 Va. 554, 566, 90 S.E.2d 159, 167 (1955); <u>Texas Co. v. Northup</u>, 154 Va. 428, 440-41, 153 S.E. 659, 662 (1930); <u>Luck v. Wood</u>, 144 Va. 355, 357, 132 S.E. 178, 178 (1926). "Where a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties; each document will be employed to ascertain the meaning intended to be expressed by the others." <u>Daugherty</u>, 238 Va. at 524, 385 S.E.2d at 574 (citing <u>American Realty Trust v. Chase Manhattan Bank</u>, 222 Va. 392, 403, 281 S.E.2d 825, 830 (1981)).

We recognize that Dr. Peyton, Dr. Lower, and Countryside were not signatories to all four of the 1997 agreements. The Stockholders' Agreement was the only one that all three parties executed. The two employment agreements were executed by Countryside and the respective physician, and both Dr. Lower and Dr. Peyton signed the Stock Purchase Agreement.

Nevertheless, we conclude that in the present case the four agreements executed in June 1997 should be regarded as "parts of one transaction" and construed as "one and the same instrument." <u>Oliver Refining Co.</u>, 109 Va. at 520, 64 S.E. at 59. We reach this conclusion because all the

13

parties knew about the agreements and executed them at the same time as part of a single transaction to accomplish an agreed purpose, i.e., to effect Dr. Peyton's purchase of 50 percent of the stock in Countryside, and to structure both his and Dr. Lower's employment relationship with Countryside and the internal operating procedures of Countryside in light of the fact that Dr. Peyton was now an equal shareholder. See Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) ("New York law . . . requires that all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties"); Cushman v. Smith, 528 So.2d 962, 964 (Fla. Dist. Ct. App. 1988) ("instruments entered into on different days but concerning the same subject matter may under some circumstances be regarded as one contract and interpreted together"); Atlas Indus., Inc. v. National Cash Register Co., 531 P.2d 41, 46-47 (Kan. 1975) (two documents construed together when parties complied with provisions of interrelated documents although one document was not executed by party to transaction); Schlein v. Gairoard, 22 A.2d 539, 540-41 (N.J. 1941) ("where several instruments are made as part of one transaction, relating to the same

14

subject-matter, they may be read together as one instrument
. . . even when the parties are not the same, if the
several instruments were known to all the parties and were
delivered at the same time to accomplish an agreed
purpose"); Baker v. Wilburn, 456 N.W.2d 304, 306 (S.D.
1990) (writings executed together as part of single
transaction should be interpreted together and "it is not
critical whether the documents were executed at exactly the
same time or whether the parties to each agreement were
identical"). Despite Dr. Peyton's argument that the
agreements should not be viewed as a "package," we believe
that he has treated them in that manner as evidenced by his
acknowledgement before both this Court and the circuit
court that all four agreements had to be signed together or
there would not have been a deal.

In reaching this conclusion, we are also persuaded by
the fact that some of the agreements contain explicit
references to the other agreements. For example, a
provision in each of the employment agreements states that,
upon the termination of the employment of that respective
physician, the purchase of any capital stock of Countryside
owned by that physician "shall be governed by provisions
with respect thereto in the Bylaws of the Corporation, any
Stockholders' Agreement then in effect and by the governing

15

statute." (Emphasis added.) A section in the Stockholders' Agreement limits the "Book Value" of Dr. Peyton's stock to the amount of the purchase price as defined in the Stock Purchase Agreement between Dr. Lower and Dr. Peyton. Finally, in the Stock Purchase Agreement, the sale of stock to Dr. Peyton is "subject to the terms of a Stockholders' Agreement . . . to be executed as a condition of Closing."

Thus, we conclude that the circuit court erred in refusing to construe the four agreements as a "package" or "as if their several provisions were in one and the same instrument." Oliver Refining Co., 109 Va. at 520, 64 S.E. at 59. By limiting its view to the terms of each separate document, the circuit court determined that Dr. Peyton had satisfied the condition precedent in paragraph 3(e)(4) of the Employment Agreement and was thus entitled to receive severance pay. Because the court looked at each agreement in isolation, it never specifically addressed the questions whether Dr. Peyton's failure to pay for his purchase of stock in a timely fashion was a material breach of the agreements, viewed as one instrument, and whether such a breach would preclude Dr. Peyton from enforcing his right to receive severance pay. Accordingly, we now turn to those questions.

In doing so, we apply the principle that "[g]enerally, a party who commits the first breach of a contract is not entitled to enforce the contract." Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997) (citing Federal Ins. Co. v. Starr Elec. Co., 242 Va. 459, 468, 410 S.E.2d 684, 689 (1991); Hurley v. Bennett, 163 Va. 241, 253, 176 S.E. 171, 175 (1934)). There is, however, an exception to that general rule "when the breach did not go to the 'root of the contract' but only to a minor part of the consideration." Horton, 254 Va. at 115, 487 S.E.2d at 203 (quoting Federal Ins., 242 Va. at 468, 410 S.E.2d at 689; Neely v. White, 177 Va. 358, 366, 14 S.E.2d 337, 340 (1941)). Nevertheless, when the first breaching party commits a material breach, that party cannot enforce the contract. Horton, 254 Va. at 115, 487 S.E.2d at 204. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Id.

Upon construing the four agreements in the present case as "parts of one transaction," Oliver Refining, 109 Va. at 520, 64 S.E. at 59, we conclude that Dr. Peyton committed the first material breach when he failed to make his monthly payments for the purchase of stock in

17

Countryside in accordance with the terms of the Stock Purchase Agreement.  It is not disputed that Dr. Peyton did not bring his stock purchase payments current at the closing and waited until August before he made the lump-sum payment, which covered only the months of January through July.  Nor is it disputed that he never made any other payments.

We believe that Dr. Peyton's failure to make his stock purchase payments goes to the "root" of the transaction. The four agreements were executed in order to effect Dr. Peyton's purchase of 50 percent of the stock in Countryside and to structure the relationship between the three parties in light of the fact that he was now an equal shareholder rather than a mere employee.  If Dr. Peyton and Dr. Lower had not executed the Stock Purchase Agreement, the other three agreements would not have been necessary. Furthermore, the terms of Dr. Peyton's Employment Agreement, as an equal shareholder in the professional corporation, were more lucrative than the terms of his first employment contract with Countryside.  A significant benefit for Dr. Peyton was the elimination of the restrictive covenant that had been part of his first employment contract.

Thus, Dr. Peyton's failure to pay the consideration for his 50 shares of stock in Countryside defeated the essential purpose of the transaction consummated in July 1997 with the execution of the four agreements and was, therefore, a material breach as a matter of law.  <u>See</u> <u>Horton</u>, 254 Va. at 115, 487 S.E.2d at 204.  Accordingly, as the first party to commit a material breach, Dr. Peyton cannot enforce the contract provision regarding severance pay.[5]  <u>See</u> <u>id.</u>

Not only was Dr. Peyton the first party to commit a material breach, he also failed to fulfill the condition precedent in paragraph 3(e)(4) of the Employment Agreement, requiring "compliance in all material respects with every material term with this Agreement."  When the four agreements are viewed as one instrument, that condition

---

[5] In his reply brief in Record No. 000572, Dr. Peyton asserts that Countryside and Dr. Lower were actually the first parties to commit a material breach.  Dr. Peyton bases that assertion on the assumption that his stock purchase payments were, in fact, supposed to have been made with pre-tax dollars.  However, Dr. Peyton did not argue before the circuit court that Countryside and Dr. Lower committed the first breach.  <u>See</u> Rule 5:25.  Furthermore, he admitted that the purpose of his testimony regarding that dispute was to explain one of the reasons why he submitted his letter of termination and also to rebut the claim for fraud asserted by Dr. Lower and Countryside.  Dr. Peyton also stated on brief in Record No. 000558 that "it is now irrelevant to Countryside's appeal whether the stock purchase agreement was to be in pre-tax or post-tax funds."

19

precedent pertains to the entire transaction and makes Dr. Peyton's obligation to pay for his purchase of stock a condition precedent to Countryside's obligation to pay Dr. Peyton severance pay.

Thus, whether Dr. Peyton's failure to pay for his stock is viewed as a first material breach or as a failure to fulfill the condition precedent, he cannot enforce the provision pertaining to severance pay.  Accordingly, we conclude that the circuit court erred in awarding severance pay to Dr. Peyton and will reverse that part of the court's judgment.  In reaching this conclusion, we recognize that the severance pay represented the collections for services that Dr. Peyton had rendered before the effective date of his termination from employment.  That fact does not change our decision.

However, Dr. Peyton argues that, since the terms of the Stockholders' Agreement obligated Countryside to buy back Dr. Peyton's stock at the same price that he had paid for it, neither Countryside nor Dr. Lower suffered any damages because of Dr. Peyton's failure to make his required payments, thereby allegedly rendering his breach

"immaterial."[6]  Dr. Peyton's argument overlooks the fact that, because of his status as a 50 percent shareholder in Countryside, he gained certain employment benefits, including the elimination of the restrictive covenant, that he had not enjoyed under his first employment contract with Countryside.  For this reason and the reasons already stated, we conclude that Dr. Peyton's breach was not immaterial.  See id. at 116, 487 S.E.2d at 204 ("proof of a specific amount of monetary damages is not required when the evidence establishes that the breach was so central to the parties' agreement that it defeated an essential purpose of the contract").  Furthermore, this Court has stated that the first party to commit a material breach can neither enforce the contract nor maintain an action on it. Hurley, 163 Va. at 253, 176 S.E. at 175.

We are also not persuaded by Dr. Peyton's assertion that Countryside and Dr. Lower are estopped from claiming a breach by Dr. Peyton.  The basis of this argument is Dr. Lower's testimony that he "agreed to wait" for the payments and did not press Dr. Peyton for those installments that were due either at the closing or for the ensuing months.

---

[6] As previously noted, the circuit court concluded that Countryside had validly and effectively exercised its right to repurchase Dr. Peyton's stock in Countryside.

21

Dr. Peyton also states that Dr. Lower did not object to a possible restructuring of the stock purchase arrangement so that the payments could be made with pre-tax dollars. According to Dr. Peyton, he relied on Dr. Lower's alleged acquiescence and, thus, asserts the defense of estoppel.

Although it is not clear whether Dr. Peyton is arguing a theory of estoppel or waiver, he has not established the necessary elements of either theory. See Employers Commerical Union Ins. Co. of Am. v. Great Am. Ins. Co., 214 Va. 410, 412-13, 200 S.E.2d 560, 562-63 (1973) (discussing elements of estoppel); Horton, 254 Va. at 117, 487 S.E.2d at 204 (discussing waiver). Furthermore, the conduct to which Dr. Peyton alludes is that of Dr. Lower. Dr. Peyton has not identified any conduct or acquiescence by Countryside that would support his claim of estoppel. Yet, under the terms of the Employment Agreement, Countryside, not Dr. Lower, had the potential obligation for paying Dr. Peyton severance pay and is the party claiming a breach by Dr. Peyton.

## II.  Dr. Peyton's Appeal

Turning now to the appeal by Dr. Peyton, we first note that, because of our finding that he is not entitled to enforce the provision of his Employment Agreement pertaining to severance pay, we do not need to address his

22

three assignments of error challenging the circuit court's calculation of the amount of that severance pay. Thus, the only remaining issues are whether the circuit court erred by failing to require that Dr. Peyton's 1997 base entitlement be calculated according to generally accepted accounting principles or by the income tax method of accounting, and that the court erred in failing to enforce the contractual provision in the Stockholders' Agreement requiring that corporate debts in excess of $5,000 be approved by all the stockholders.[7]

The crux of Dr. Peyton's argument with regard to the accounting method is the change in the quarterly reports prepared by Dante Anthony Zagami, Jr., a certified public accountant whose firm commenced performing work for Countryside in 1996. The first two quarterly reports for 1997 were designated "Statement of Revenue and Expenses," whereas, the last two reports prepared after Dr. Peyton tendered his termination of employment were designated

---

[7] Countryside argues on brief in Record No. 000572 that Dr. Peyton's first material breach should bar not only Dr. Peyton's recovery of severance pay but also any larger sum for his 1997 base entitlement. However, Countryside only assigned error to the award of severance pay. Thus, the only issue before this Court with regard to Dr. Peyton's base entitlement is the amount of that compensation and not whether he is precluded from enforcing that provision of his Employment Agreement because of his first material breach.

"Schedule of Revenue and Operating Costs."  Dr. Peyton contends that the change in the title of the quarterly reports denotes a change in the accounting method used for Countryside.  Thus, according to Dr. Peyton, the category of expenses allocated to him was enlarged, thereby reducing his compensation, and the allocation was in violation of the requirement in the Employment Agreement that the expense categories "shall be defined by mutual agreement of the Corporation and the Physician and applied consistently from year to year."  He claims that the expense categories were never defined "by mutual agreement" and that Zagami created his own accounting method to determine Dr. Peyton's compensation.

Based on calculations by his accountant, Erik Karl Kloster, Dr. Peyton claims that he is still owed $160,961 for his 1997 base entitlement.  In arriving at this figure, Kloster primarily challenged the allocation of certain expenses to Dr. Peyton.  Kloster defined the term "expense" as "an item that is ordinarily used up during the course of an accounting period, such as one year."  Using that definition, he concluded that certain prepaid expenses were actually the acquisition of fixed assets that should not have been used to reduce Dr. Peyton's entitlement.  According to Kloster, a prepaid asset only "becomes an

expense when the time period of the prepayment has come to pass." However, Kloster admitted Countryside was on a cash basis method of accounting.

The circuit court rejected Kloster's calculations. After examining numerous expenses that Dr. Peyton alleges were incorrectly allocated to him, the court concluded that Dr. Peyton had actually received an overpayment in 1997. The court determined that the Employment Agreement does not require the use of generally accepted accounting principles or an income tax method of accounting in determining Dr. Peyton's base entitlement. Instead, the court concluded that Zagami calculated Dr. Peyton's compensation pursuant to the terms of the Employment Agreement and allocated expenses as mutually agreed upon by Dr. Lower and Dr. Peyton. Finally, the court determined that Zagami changed the format of the last two quarterly reports because of the execution of the Employment Agreement in June 1997 but that Countryside had not changed its method of accounting after June 1997.

Upon our review of the record, we conclude that the circuit court's conclusions are not plainly wrong or without evidence to support them. See Code § 8.01-680; Martin v. Penn, 204 Va. 822, 826, 134 S.E.2d 305, 307 (1964) (court trying case without jury determines weight to

25

be given to testimony of expert witness). Although Dr. Peyton has argued in detail about specific expenses that were allocated to him, his assignment of error encompasses only the question regarding which accounting method should have been used to calculate his 1997 base entitlement. The terms of Dr. Peyton's Employment Agreement do not require the use of generally accepted accounting principles or an income tax method of accounting. The agreement does, however, say that the terms "Fixed Expenses," "Individual Expenses," and "Variable Expenses" shall be defined by mutual agreement between Countryside and Dr. Peyton. It also states that if Dr. Peyton receives "an Entitlement in any fiscal year which is later determined by [Countryside's] accountant to be more than the amount to which" Dr. Peyton was entitled to receive, the excess will be deducted from Dr. Peyton's compensation in the subsequent year.

Zagami testified that Countryside did not change its method of accounting in 1996 or 1997. He also testified that the "Statements of Revenue and Expenses" for the year ending on December 31, 1997, did not establish the allocation of expenses to each physician. For example, Zagami explained that the expense category for depreciation and amortization was not an expense used in the calculation

of base entitlement because the entitlement formula was based on cash flow and that particular category related to income tax guidelines.  Under the corporation's cash basis of accounting, expenses were deducted when paid and income was recognized when received.

Zagami further testified that he used the parties' agreement in allocating expenses for the purpose of making the entitlement calculation and did not follow generally accepted accounting principles because the Employment Agreement did not require him to do so.  He specifically stated that it was his position "that the allocations that [he] made were in [accordance with the] agreement[s] of the two physicians" and that those agreements were the result of conversations that he had with both physicians.  Notably, his calculations of the 1997 entitlements for Dr. Peyton and Dr. Lower, unlike those by Kloster, showed both physicians receiving almost equal revenue.[8]

Thus, finding sufficient evidence to support the circuit court's determination that Zagami calculated Dr. Peyton's 1997 base entitlement pursuant to the terms of the Employment Agreement and allocated expenses as mutually

---

[8] According to Zagami's calculations, there was a difference of approximately $6,000 between Dr. Lower and Dr. Peyton with regard to their respective excess revenue over operating costs.

agreed upon by Dr. Peyton and Dr. Lower, we conclude that the court did not err in failing to require the use of generally accepted accounting principles or the income tax method of accounting.  Accordingly, we will affirm the circuit court's judgment with regard to Dr. Peyton's base entitlement for 1997.[9]  Because the court concluded that Dr. Peyton had been overpaid in the amount of $1,100.35, we will enter judgment in favor of Countryside in that amount since Dr. Peyton will not be receiving any severance pay from which to deduct that overpayment.

We now consider the last issue regarding the requirement in the Stockholders' Agreement that any corporate debt in excess of $5,000 must be approved by all the stockholders.  Dr. Peyton asks this Court to consider the alleged violation of this provision as an alternative argument if the Court disagrees with his position regarding the appropriate accounting method for computing his 1997 base entitlement.[10]

---

[9] We also conclude, as did the circuit court, that the decisions in Virginia State AFL-CIO v. Commonwealth, 209 Va. 776, 167 S.E.2d 322 (1969), and Safway Steel Scaffolds of Va. v. Coulter, 198 Va. 469, 94 S.E.2d 541 (1956), are not relevant to the issues in this appeal, primarily because this case must be decided based on the terms of the June 1997 agreements.

[10] The expenses that Dr. Peyton identifies as having been incurred in violation of that provision are changes to

Dr. Peyton's accountant, Kloster, identified these expenses when he recalculated Dr. Peyton's 1997 compensation. The circuit court considered those expenses in that context, but it is not clear whether Dr. Peyton made a separate argument that the expenses were incurred in violation of the Stockholders' Agreement. Nevertheless, in determining the amount of Dr. Peyton's base entitlement, the court found that Dr. Peyton had agreed to each one of the expenditures. As we have already stated, we find sufficient evidence to support the circuit court's factual findings regarding Dr. Peyton's 1997 base entitlement. Thus, there could not have been a violation of the Stockholders' Agreement with regard to these expenses since Dr. Peyton agreed to them.

CONCLUSION

For these reasons, we will reverse the judgment of the circuit court in Record No. 000558 and enter final judgment in favor of Countryside. In Record No. 000572, we will affirm the judgment of the circuit court and enter final judgment in favor of Countryside in the amount of $1,100.35.

Record No. 000558 — <u>Reversed and final judgment</u>.
Record No. 000572 — <u>Affirmed and final judgment</u>.

_____

a new office, overages to build-out the new office, and the buy-out of an existing lease.

29