# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Shen Valley Masonry, Inc.

v.

S. P. Cahill & Associates, Inc., et al.

December 11, 2001

Case No. (Law) 00-75

BY JUDGE EDWARD L. HOGSHIRE

The instant action arose from a dispute between a general contractor and a subcontractor who undertook to construct the University of Virginia student residence facility now known as Woody Hall. At issue is the effect of the mutual breaches and termination on the partially-completed contract. Final briefs were submitted by the parties on October 31, 2001, after certain preliminary findings were made by the Court. After due consideration of the record, including evidence introduced at trial, closing briefs, exhibits, trial transcript, and applicable law, this Court awards the subcontractor $336,618 plus interest. The Court's reasoning behind the final decision follows herein below.

## Procedural History

Plaintiff, Shen Valley Masonry, Inc. ("Subcontractor"), filed a motion for judgment against Defendant S. P. Cahill & Associates, Inc. ("Contractor"), its bonding company, Great American Insurance Company, and the University of Virginia ("UVA") for breach of contract. Subcontractor prayed that this Court would impose damages of $332,033 in completed but unpaid labor, $51,539 in lost profit, $4,585 in clean up and equipment removal costs, and interest.

Contractor filed a counterclaim against Subcontractor and its bonding company, American Casualty Company, for breach of contract. Contractor sought damages for the cost to complete and repair Subcontractor's masonry work, $5,000 per day liquidated damages for each day the project was pushed over schedule by Subcontractor, and attorney's fees.

This Court issued an opinion dated July 31, 2000, dismissing UVA with prejudice from the action on grounds of both failure to state a cause of action and sovereign immunity.

A bench trial was held before this Court on January 25 and 26, 2001.

## I. *Statement and Findings of Fact*

### A. *Overview*

In an effort to house their ever-expanding student body, UVA accepted a bid from Contractor to build a new student residence facility ("Woody Hall"). Pursuant to the Virginia Public Procurement Act, Virginia Code § 11-35 *et seq.*, UVA and Contractor executed a $4,484,275 contract for the dorm's construction ("Prime Contract") on March 17, 1999.

The Prime Contract provided that Woody Hall was to be constructed and substantially completed by June 30, 2000. (Form of Agreement, 1.) As added incentive to meet this deadline, UVA reserved the right to charge Contractor $5,000 per day liquidated damages if Woody Hall was not constructed in time. (Prime Contract § 43, Tr. Trans. 727.) To ensure that these penalties would not accrue, Contractor designed an aggressive schedule which substantially improved on UVA's timetable ("April schedule").[2] (Tr. Trans. 705, 708.)

This compacted schedule was presented to five interested masonry subcontractors, each of whom submitted bids based on this timeline. (Tr. Trans. 603-04.) The two low bidders were within $60,000 of one another; the lowest was submitted by Subcontractor. On April 9, 1999, Contractor and Subcontractor entered into an agreement ("Subcontract") to perform all requisite masonry work on Woody Hall for $1,048,176. The Subcontract

---

[2] The April schedule was not produced by either Contractor or Subcontractor. Contractor's owner testified that he threw out all of his copies. (Tr. Trans. 715, 720-21.) Subcontractor claimed that the April schedule was not attached to the Subcontract. (Tr. Trans. 27.)

likewise contained a $5,000 per day liquidated damages provision mirroring the Prime Contract. (Subcontract § 2.1.)

Immediately acting on UVA's notice to proceed, on April 5, 1999, Contractor began the process of preparing the project site by erecting a safety fence and clearing the topsoil. (Tr. Trans. 793.) Following the May departure of the students, the excavation subcontractor started digging. (Tr. Trans. 691.) Although UVA performed three boring tests which determined that there was no rock under the construction site, Cahill had seen rock sticking out of the ground and suspected its existence. (Tr. Trans. 678-79.) His suspicion was soon confirmed by the excavation subcontractor whose backhoe was ineffective on the subterrain material.[3] A trackhoe, a heavy digging machine, which accomplishes what a backhoe cannot, was imported from Virginia Beach in order to conquer the rock. (Tr. Trans. 888.) While UVA had protected itself from this possibility with a rock clause in the Prime Contract, the compressed April schedule was susceptible to rock-related delays.

## B. *Decision to Split Woody Hall into Two Sections*

As in all construction projects, there was a critical path, or necessary order, in which the Woody Hall construction needed to proceed, to wit: first, the site needed to be dug by the excavation subcontractor, so that the footers[4] could be poured by Contractor. This would then permit Subcontractor to lay block on top of the footers to create bearing walls. (Tr. Trans. 911.) The extensive rock removal process significantly delayed the project, thus nullifying the April schedule timeline. Due to the absence of the April schedule, the exact delay caused by the rock removal is unknown; however, the footers were not fully complete until August 23, 1999, approximately 30 to 45 days behind schedule. (Tr. Trans. 332-33.) As a direct consequence, Contractor was delayed in pouring the footers and Subcontractor in laying block.

Subcontractor initially arrived on the site June 7, 1999, prior to any request by Contractor. (Tr. Trans. 68.) Upon discovering that Contractor was not ready for the masonry work to begin, Subcontractor's crew departed but returned, again unsought, on June 16, 1999. (Tr. Trans. 795-96.) By that time, there were enough solidified footers in the south section of the building for a

---

[3] In the context of pre-construction excavation, "rock" is considered material which a backhoe cannot effectively remove. (Tr. Trans. 679.)

[4] Footers are concrete foundational support upon which the bearing walls are built. Their construction was the responsibility of Contractor.

reduced masonry crew to start work. Jerry Neff, Subcontractor's owner, admitted that he was eager to begin because of a conflict with another masonry project. (Tr. Trans. 175-77.) Scott Cahill, Contractor's owner, was also anxious to commence construction in order to get the project on-track and avoid UVA's liquidated damages.[5] In satisfaction of both objectives, Contractor devised a plan to divide the building construction into distinct north and south sections.[6] (Tr. Trans. 303-05, 433.) This new plan of action entailed stair-stepping the building; Woody Hall's south section would always remain one floor ahead of the north section.

Coinciding with Subcontractor's arrival, the June 18 schedule ("June schedule") was created, reflecting the north-south division. A flurry of schedules was created to accommodate the increasing delays; a new schedule was frequently produced (Tr. Trans. 299) to the detriment of Contractor's credibility.[7] (Tr. Trans. 627.) All schedule changes were discussed at regular meetings and Subcontractor was given a chance to dispute allotted timeframes. (Tr. Trans. 721.) Furthermore, an official schedule was not approved by UVA until December 23, 2000. (Tr. Trans. 362.)

### C. Masonry Crew's Size

Although the north-south division's intrinsic space constraints and critical path implications directly affected the size of the masonry crew,[8] the Contractor contended that delays on the project were due to Subcontractor's inability to provide a large enough masonry crew despite these space constraints. (Tr. Trans. 621.) Cahill testified he and Neff made an extra-contractual agreement stipulating that Subcontractor would provide 25 masons per day. (Tr. Trans. 701.) Neff testified that he never agreed to this. (Tr. Trans 1003.) Regardless of whether this extra-contractual agreement existed, Subcontract § 1.1 prohibits it: "This agreement represents the entire

---

[5]  At trial, Cahill asserted that the decision to spit Woody Hall was a courtesy to Subcontractor, saying that Subcontractor was concerned that the masonry crew would not return to the site if there was a delay. The Court rejects this contention.

[6]  While it is one connected unit, Woody Hall's two sections are juxtaposed at a 161° angle, giving it a dogleg appearance and making a natural demarcation on which to divide the building. The south section is about twice as large as the north section. (Def. Ex. 16.)

[7]  Cahill testified at trial, "I would say after the first five remakes of the schedule or so, nobody could believe what I said anymore." (Tr. Trans. 627.)

[8]  Subcontractor's crew was composed of masons, helpers, and supervisors. Each mason requires the help of one to one-and-one-half helper. (Tr. Trans. 453.)

agreement between the parties hereto." Therefore, no oral agreement is binding.

The Subcontract does not specify a requisite number of crew members but denotes, "[s]ubcontractor shall increase labor force ... or whatever is necessary to comply with the dates of the Project Schedule." (Subcontract, § 8.) The Subcontract's "Project Schedule" is the April schedule, specifically incorporated into the Subcontract and attached thereto. Therefore, the size of the masonry crew was to be dictated by the crew's ability to keep up with the dates in the aggressive April schedule.

In the conspicuous absence of the April schedule, Contractor presented evidence that Subcontractor's inability to provide a sufficient number of employees caused the major delays: first, Subcontractor placed unanswered advertisements searching for additional masons[9] (Tr. Trans. 318); second, the distance between Subcontractor's Harrisonburg office and Woody Hall's Charlottesville location constitutes a 63 mile trek across the Blue Ridge Mountains (Tr. Trans. 618); third, the booming construction market adversely impacted hiring ability (Tr. Trans. 631); finally, Contractor produced letters documenting their repeated appeals for Subcontractor to hire additional workers. (Def. Ex. 3, 4, 7, 9, 14.)

In an effort to rebut such assertions, Subcontractor presented expert testimony from a masonry contractor who built a similar, neighboring dormitory. (Tr. Trans. 380-81.) This project, completed in a timely manner, averaged eight masons per day. (Tr. Trans. 359.) Considering the space constraints which the north-south division created, it was not clear that the job site could accommodate that crew size. (Tr. Trans. 357.) Nonetheless, Subcontractor bound itself to the aggressive April schedule and was therefore obligated to provide enough masons to prevent schedule slippage. While it may not have been economically prudent to increase the crew, this is not a defense to a contractual obligation; therefore, the Court finds that Subcontractor breached the contract by not providing sufficient employees to meet schedule demands.

## D. *Contractor's Late Payments to Subcontractor*

Meanwhile, Contractor's actions also placed it in breach of contract. The Virginia Public Procurement Act required the Contractor:

---

[9] Subcontractor claims that these ads were placed in an effort to upgrade the quality of the masonry crew by replacing less qualified employees. (Tr. Trans. 318.)

to take one of the two following actions within seven days after receipt of amounts paid to the contractor by the state agency ... for work performed by the subcontractor under that contract: a. Pay the subcontractor for the proportionate share of the total payment received from the agency attributable to the work performed by the subcontractor under that contract; or b. Notify the agency and the subcontractor, in writing, of his intention to withhold all or part of the subcontractor's payment with the reason for nonpayment.

Virginia Code § 11-62.9. Subcontract § 1.1 incorporated this statute into the agreement and its provisions are mirrored in Prime Contract § 37, also incorporated by Subcontract § 1.1. Therefore, Contractor was obliged to pay Subcontractor within seven days after it received payment from UVA. The following chart shows that not one of the five payments made to Subcontractor complied with this provision.

| Date UVA wrote check[10] | Date Contractor represented it received/deposited check[11] | Date Subcontractor received check |
|---|---|---|
| 7/13/99 | 7/23/99 | 8/02/99 |
| 8/16/99 | 8/23/99 | 9/08/99 |
| 9/17/99 | 10/01/99 | 11/06/99 |
| 11/02/99 | 11/08/99 | 12/07/99 |
| 12/02/99 | 12/09/99 | 12/28/99 |

Under Virginia Code § 11-62.6, the date of the postmark is deemed the date payment is made. No direct postmark evidence was presented to this Court. Even in the absence of such evidence, it is clear that Contractor unnecessarily delayed payment to Subcontractor. No postal system or other delay can account for the average thirty day turnaround between when UVA

---

[10] These are dates taken from Plaintiff's Exhibit 23 which is a UVA-generated record of when checks were written to Contractor. Testimony from UVA staff demonstrated that each approval process preceeded the dates on which UVA wrote these checks to Contractor and therefore there would be no additional delay between when UVA wrote the check and mailed it. The Court infers that the date on which UVA wrote the checks is their postmark date.

[11] In a January 6, 2000, letter, Contractor represented to UVA these dates as when the checks were "[r]eceived in our office." (Pl. Ex. 35.) At trial, these dates were represented to the Court as dates on which Contractor deposited checks. (Def. Ex. 12.) The deposited checks were not proffered as evidence.

wrote a check and when Subcontractor received its rightful funds therefrom. The Court finds that Contractor did not make payments in a timely manner, directly contravening Virginia Code § 11-62.9, and therefore breached the Subcontract.

While the first five payments were late, they were at least received. Subcontractor was not paid its final three payment requests which constituted work completed from November 1 to January 6. (Pl. Ex. 4, Def. Ex. 12.) No written notification was given to either UVA or Subcontractor, as required by Virginia Code § 11.62.9 for partial or full withholding. Furthermore, Contractor affirmatively represented to UVA that payment had been made to Subcontractor by signing multiple Schedules of Values and Certificates for Payment. (Pl. Ex. 8.) These documents required Contractor to certify to UVA that, "All previous progress payments received from the Owner on account of Work done under this contract have been applied to discharge in full … all obligations of Contractor incurred in connection with Work covered by prior Certificates of Payment. …" (Pl. Ex. 8.) Contractor certified throughout the relevant period that he had paid Subcontractor, thereby inducing UVA to pay out additional monies which Contractor kept for itself instead of paying to Subcontractor.

E. *Supplemental Masons*

With the late payments and masonry under-staffing, both Contractor and Subcontractor initiated a barrage of antagonistic letters, citing their respective gripes. Contractor's correspondence threaten the imposition of liquidated damages if Subcontractor did not increase their manpower to keep up with the schedule. (Def. Ex. 3, 4, 7, 9, 14.) Subcontractor responded that it would not add additional members to the masonry staff unless it was paid in a prompt manner. (Pl. Ex. 14, 18, 19.) Although both parties were in breach of contract and threatened one another with their contractual remedy arsenal, neither party actually terminated the contract. This standoff is reflected in the final correspondence exchange between the parties: A December 22, 1999, letter from Contractor recounts mason shortages and then reads:

> Obviously, this staffing is woefully inadequate to keep your commitments to Cahill. Please staff this job properly. As we continue to note and to document, you are directly impacting our critical path by your delays and we continue to hold you responsible for liquidated and actual damages incurred as per your executed subcontract agreement with Cahill.

(Def. Ex. 9.) On December 28, 1999, Subcontractor writes:

> In response to your letter dated 12-22-99, we feel that since S. P.
> Cahill is already in breach of the contract, due to nonpayment 60
> days in arrears, we are staffing the project more than adequately. If S.
> P. Cahill would make payment in a timely manner we would be more
> than happy to supply more personnel.

(Pl. Ex. 19.)

This impasse was soon addressed aggressively when Contractor exercised its right to bring in supplemental masons. Subcontract § 2.1 provides:

> Contractor shall have the benefit of all rights, remedies, and redress
> against Sub-contractor as are prudent and necessary in the sole
> discretion of the Contractor to allow completion of the Project within
> schedule parameters. ... Such remedies may include ...
> supplementing crew of sub-Contractor by Contractor to bring Sub-
> Contractor up to the level of quality and quantity of the contracted
> work. Such remedies shall be in the sole discretion of Contractor and
> costs associated with these remedies shall be charged against the
> account of subcontractor. ...

On January 4, 2000, Contractor supplemented the existing nineteen member (Tr. Trans. 559, Pl. Ex. 28) masonry crew with five additional people. (Pl. Ex. 28.) On the first day, the two groups were able to integrate themselves in a productive manner. (Tr. Trans. 826.) However, this peaceful assimilation ended when Subcontractor's crew discovered that Contractor's newly-hired men were being paid $3.00 more per hour. (Tr. Trans. 309, 559.) In reaction, Subcontractor directed its employees not to cooperate with Contractor's new hires. (Tr. Trans. 309.)

## F. *Contract Termination*

Upon the arrival of Subcontractor's Project Manager, Ralph Hensley on the morning of January 6, 2000, an open and disruptive conflict between Contractor's and Subcontractor's men erupted. The evidence as a whole demonstrated that Hensley observed mortarpans and other materials being shared between the crews, contrary to the non-cooperation directive. A heated conversation ensued between Hensley and Contractor's General Superintendent, Bill Padgett. Therein, Hensley directed his men not to share materials, equipment, and scaffolding. (Tr. Trans. 828.) After much shouting

and outbursts of temper, largely on the part of Subcontractor's personnel, Padgett telephoned the police, who escorted Hensley involuntarily from the site. (Tr. Trans. 311, 564, 830.)

As a result of Hensley's actions, Subcontractor violated Subcontract § 4.1.8 which reads in pertinent part, "The Subcontractor shall cooperate with the Contractor, other subcontractors and the Owner's own forces whose Work might interfere with the Subcontractor's Work. ... Affected Sub-contractors shall develop and carry out coordination plans as are required to allow for the proper use of shared mechanical or other spaces."

Padgett and Subcontractor's Masonry Superintendent, Paul Phillips, each telephoned their superiors to report the incident and receive further instructions. (Tr. Trans. 829, 830.) During Padgett's conversation, Cahill directed him to request Subcontractor's entire crew to leave. (Tr. Trans. 830.) Padgett relayed this invitation, but Phillips refused on Subcontractor's behalf. Padgett beckoned the police for the second time. (Tr. Trans. 830.) Phillips advised police that they would have to take him out in handcuffs. (Tr. Trans. 566, 830.) When it became evident to Phillips that the police would force the crew to leave, Subcontractor's employees left without incident. (Tr. Trans. 831.)

Contractor claims that it terminated the Subcontract a few days after the January 6, 2000, incident when Subcontractor failed to return to Woody Hall. (Tr. Trans. 648-49.) However, January 6, 2000, correspondence clearly demonstrates that Contractor had already enlisted another masonry subcontractor to take over Subcontractor's job starting the next morning. (Pl. Ex. 7, 34, Tr. Trans. 671.) Based on all of the evidence presented, Contractor clearly terminated the Subcontract on January 6, 2000, by having Subcontractor's supervisors physically removed by the police. Contractor did not give any written notice to Subcontractor concerning this breach nor was there an opportunity to correct afforded to Subcontractor.

By January 6, 2000, Subcontractor had completed 53 percent of its work on Woody Hall. (Pl. Ex. 4.) Contractor was paid $507,788 by UVA for Subcontractor's work but only turned over $224,814.43 to Subcontractor. (Pl. Ex. 4.) Woody Hall was finally completed November 2000, months behind schedule and over $1,000,000 in excess of budget. (Tr. Trans. 985.)

## II. *Analysis*

### A. *Breaches of Contract*

The evidence established three breaches of contract prior to contract termination: (1) Contractor breached Subcontract § 4.2.2 and Prime Contract

§ 37 by violating Virginia Code § 11-62.9's prompt payment provisions; (2) Subcontractor breached Subcontract § 8 by not increasing labor force or doing whatever was necessary to comply with the Project Schedule; and (3) Subcontractor's non-cooperation with Contractor's supplemental masons breached Subcontract § 4.1.8. A fourth breach occurred as a result of contract termination: (4) Contractor breached Subcontract § 7.2 by failing to provide notice and opportunity to remedy alleged shortfalls in performance to Subcontractor.

The party who commits the first breach of a contract is not entitled to enforce the contract. *Countryside Orthopedics v. Peyton*, 261 Va. 142, 153-54 (2001); *Horton v. Horton*, 254 Va. 111, 115 (1997); *Federal Ins. Co. v. Starr Elec. Co.*, 242 Va. 459, 468 (1991); *Hurley v. Bennett*, 163 Va. 241, 253 (1934). An exception to this rule arises when the breach did not go to the "root of the contract" but only to a minor part of the consideration. *Countryside Orthopedics*, 261 Va. at 154; *Horton*, 254 Va. at 115; *Federal Ins. Co.*, 242 Va. at 468; *Neely v. White*, 177 Va. 358, 366 (1941). If the first breaching party committed a material breach, however, that party cannot enforce the contract. *Neely*, 177 Va. at 366-67. If the initial breach is material, the other party to the contract is excused from performing its contractual obligations. *Horton*, 254 Va. 111 at 115.

The temporal order of the breaches committed in this case is therefore especially significant. Subcontractor's non-cooperation breach occurred on January 5, 2000. Contractor's own expert assigned August 4, 1999, as the first day on which Subcontractor's delays began. (Def. Ex. 19.) Viewed in the light most favorable to Contractor, Subcontractor's understaffing breach occurred on August 4, 2000. As to the prompt payment breach, again viewed deferentially, Contractor claims to have received its first payment destined for Subcontractor on July 23, 1999. Contravening Virginia Code § 11-62.9's seven day turnover requirement, Contractor did not pay Subcontractor until August 2, 1999. Contractor therefore was in breach of contract by at least July 30, 1999. Even when utilizing Contractor's own data, it is evident that Contractor committed the first contractual breach. Contractor's payment omissions significantly predated Subcontractor's understaffing and were not done responsively as Contractor argues.

As to the materiality of this breach, "failure of a … contractor to make progress payments as due to [a] subcontractor[] is a material breach of the contract." *In re Vecco Constr. Industries, Inc.*, 30 B.R. 945, 948-49 (Bankr. E.D. Va. 1983) (citing, *United States v. Curtis T. Bedwell & Sons, Inc.*, 506 F. Supp. 1324, 1327 (E.D. Pa. 1981); *Zulla Steel, Inc. v. A. M. Gregos, Inc.*, 415 A.2d 1183 (N.J. Super. A.D. 1980); *United States v. Community Science Technology, Inc.*, 574 F.2d 1292, 1295, n. 3 (5th Cir. 1978). However,

conduct by one party which leads another to reasonably believe that "performance on time will not be insisted on will operate as a waiver of the time condition, as to subsequent defaults as well as antecedent ones." Corbin, *Corbin on Contracts*, § 754 (1 vol. ed. 1952). Contractor argues that this rule operates to excuse its late payments. To the contrary, the evidence as a whole demonstrated that Subcontractor objected to the late payments and Contractor was apologetic for their lateness, thereby evincing that Subcontractor did not waive its right to demand timely payment. (Pl. Ex. 5, 14, 18, 19, Tr. Trans. 699.)

Contractor's breach of Subcontract § 4.2.2, which incorporated Prime Contract § 37, and of Virginia Code § 11-62.9's prompt payment provisions is material. Two related conclusions of law stem from this initial material breach: (1) Contractor is not entitled to enforce the Subcontract and (2) Subcontractor is excused from performing its contractual obligations. Because Contractor cannot enforce the $5,000 per diem liquidated damages provision and Subcontractor was not obliged to fully staff the project, Contractor's prayer for liquidated damages is denied.

## B. *Contract Termination*

Subcontract § 7.2 controls termination by Contractor:

If the Sub-Contractor in the Contractor's sole opinion persistently or repeatedly fails or neglects to carry out Work in accordance with this Agreement *and or* upon written notice thereof fails to immediately remedy such shortfalls, the Contractor may without prejudice to any other remedy the Contractor may have, terminate the Sub-Contract and finish the Sub-Contract Work by whatever method Contractor deems appropriate. If the unpaid balance of the Sub-Contract Sum exceeds the cost of finishing such work, such excess shall be paid to Subcontractor, but if such expense exceeds unpaid balance, the Sub-Contractor shall pay the difference to the Contractor.

(Emphasis added.)

The words "and or" as found in Subcontract § 7.2 are ambiguous. Contractor asserts that this language makes written notification optional. The Court disagrees. The "and or" language can only be logically read to require written notification. The word "thereof" would otherwise render the later statement meaningless because there can be no written notice of a failure without such a failure. Because ambiguity is construed against the drafter, written notification is required for Contractor to terminate the Subcontract.

The Court found that Contractor terminated the Subcontract on January 6, 2000 by directing police to physically evict Subcontractor's personnel from the project site. This termination was a direct consequence of Subcontractor's non-cooperation with supplemental masons, which placed it in breach of Subcontract § 4.1.8. There is no evidence of any written notification from Contractor to Subcontractor regarding this refusal to collaborate. Because Contractor did not provide Subcontractor with written notification with an opportunity to remedy the alleged failure of performance, it wrongfully terminated the Subcontract.

## Conclusion

Contractor's wrongful termination bars it from collecting the cost to complete the Subcontract. However, the wrongful termination allows Subcontractor to collect $332,033 in completed but unpaid labor and $4,585 in clean up and equipment removal costs.

In accordance with Virginia Code § 11-62.11, the Court further awards interest at a rate of one percent per month on the $332,033 in completed but unpaid labor. This interest will begin to accrue seven days after Contractor received payment from UVA. Due to discrepancies in dates when monies were distributed to Contractor and the absence of additional UVA data from Plaintiff's Exhibit 32, dates for this calculation shall be drawn from Plaintiff's Exhibit 4. Lost profits were not proven to any degree of certainty and are therefore denied.