108

## CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

Bel-Aire, Inc.,
and Kings Way Corp.

v.

RB Trexlertown, L.L.C., et al.

May 24, 2005

Case No. (Law) CL04-1403

BY JUDGE FREDERICK B. LOWE

This case arises out of a written contract (Agreement) dated April 23, 2003, between Bel-Aire, Inc., and Kings Way Corporation to sell 69.57 acres of real property, referred to in the agreement as Parcels 9 and 11, to RB Trexlertown, L.L.C., located near the intersection of General Booth Boulevard and Dam Neck Road in Virginia Beach, Virginia. The agreement stated that Defendant was to make certain non-refundable payments[1] that would later be applied toward the $17,300,000 purchase price. After Defendant paid $400,000 into escrow with the Fidelity National Title Insurance Company, as the parties agreed, problems began to appear with regard to the sale. After Defendant failed to make its $200,000 payment on the 241st day and close on the property by the

---

[1] $50,000 to be paid at the execution of the agreement; $150,000 on the 31st day after the date of the agreement; $200,000 on the 121st day after the date of the agreement; and $200,000 on the 241st day after the date of the agreement. Agreement, p. 4-5 P2 A.-D.

extended closing date, Plaintiffs sought to have the non-refundable funds released to them. When Defendant refused to agree that the funds be released to Plaintiff, Plaintiff filed suit May 17, 2004.

Defendant filed a Counterclaim seeking the repayment of the $400,000 deposited into escrow based on the alleged default and breach by Plaintiffs for their failure to perform their duties pursuant to the contract. Defendant argues that Plaintiffs are not entitled to the funds because they breached the agreement by failing to sub-divide the property and failing to execute the Reciprocal Easement Agreement (REA), both conditions precedent to closing. Defendant also filed Grounds of Defense, maintaining that the Agreement violates the rule against perpetuities and the forfeiture of $400,000 constitutes an unreasonable penalty, not liquidated damages. This matter was heard at a bench trial on April 19, 2005, and the court took the case under advisement.

After a careful review of the facts of this case, the briefs, and case law submitted by the parties, this court finds that the Plaintiffs' actions did not constitute a material breach of the Agreement, the Agreement does not violate the rule against perpetuities, and the deposited funds constitute liquidated damages, not an unenforceable penalty. As such, the $400,000 earnest money deposit should be released to Plaintiffs and Defendant's Counterclaim dismissed.

## Breach

A breach of contract claim requires allegations that the defendants have failed to perform under or breached an agreement, causing actual damages that are recoverable under Virginia law. *Haass & Broyles Excavators, Inc. v. Ramey Bros.*, 233 Va. 231, 235-36, 355 S.E.2d 312, 315, (1987). The facts show that Defendant made the first three payments, totaling $400,000, as agreed but failed to make the final $200,000 payment or to close on the property. This is a breach of the Agreement. What is less apparent is whether Plaintiffs breached the Agreement first. Generally, a party who commits the first material breach of a contract is not entitled to enforce the contract. *Horton v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997) (citations omitted). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154, 541 S.E.2d 279, 285 (2001) (citations omitted). Defendant claims Plaintiffs breached the Agreement first by failing to sub-divide the

property as contemplated by the Agreement, not exercising good faith and due diligence in sub-dividing the property, and failing to establish a REA. Consequently Defendant argues Plaintiffs should be barred from receiving the deposited funds.

Neither party claims that the contract is ambiguous in any way and "when contract terms are clear and unambiguous, a court must accord those terms their plain meaning." *Quadros & Assocs., P.C. v. City of Hampton*, 268 Va. 50, 54, 597 S.E.2d 90, 93 (2004). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Christopher Assocs., L.P. v. Sessoms*, 245 Va. 18, 22, 425 S.E.2d 795, 797 (1993) (citing *Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962)). "A court may not 'add to the terms of the contracts of parties by construction, in order to meet the [circumstances] of a particular case'." *Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 329, 609 S.E.2d 49, 56 (2005) (citing *C. S. Luck & Sons, Inc. v. Boatwright*, 157 Va. 490, 497, 162 S.E. 53, 55 (1932)). The contract must therefore be examined as written.

The Agreement states the following with regard to sub-dividing the property:

> P1. A. Subject to the terms and conditions included in this Agreement, Seller shall sell and convey to Buyer approximately 69.57 acres described as Parcels 9 and 11 as shown on Exhibit A attached hereto entitled Bel-Aire Property Princess Anne Borough, Virginia Beach, Virginia, Revised 4/11/03 (together with all appurtenant rights, the "Property"). The Property shall require subdivision and/or other adjustment of property line in order to separate it from other property owned by Seller, which may necessitate that the parcel numbers of the Property (9 and 11) be re-designated. Seller shall, at Seller's sole expense, *immediately undertake to obtain said subdivision and/or adjustment of property lines* and if same is not approved by the date of Closing, as defined in section 3 below, the date of Closing shall be extended day-for-day until Seller's subdivision and/or adjustment of property lines is approved. . . .

(Emphasis added.) This language makes the subdivision of the property a condition precedent to closing and requires Plaintiffs (Seller) to

accomplish the subdivision of the property at their expense. Defendant focuses its argument on the term "immediately" claiming that Plaintiffs failed to perform their duty to sub-divide the property in the time contemplated by the contract.

While it is true that "words that the parties used are normally given their usual, ordinary, and popular meaning." *Haisfield v. Lape*, 264 Va. 632, 637, 570 S.E.2d 794, 796 (2002) (citation omitted). "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D. C. McClain, Inc. v. Arlington County*, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995) (citations omitted). Thus this court cannot construe the contract simply by focusing in on a single term. (Defendant urges the court to look only at the term "immediately.") Instead the court must look at the full phrase: "immediately undertake."

The usual and customary meaning of "immediate" is "acting or occurring without the interposition of another agency or object: direct," "directly apprehend or perceived," "next in line or relation," "occurring at once," "of or near the present time," "of or pertaining to the present," or "close at hand." *The American Heritage Dictionary* 643 (2d college ed. 1985). While the dictionary describes "immediately" as "without intermediary" or "without delay," *Id.*, "undertake" is commonly understood to mean, "to take upon oneself; decide or agree to do," "to pledge or commit oneself" or "to make oneself responsible." *Id.* at 1319. Taken together, all Plaintiffs agreed to do was to without delay take upon themselves the responsibility to sub-divide the property. Although the property was not in fact sub-divided until August 20, 2004, seven months after the date originally contemplated in the Agreement,[2] this was not a material breach of the parties' contract allowing Defendant to refuse to continue to make payments on the property as specified by the Agreement.

As for Defendant's other contention that Plaintiffs breached the Agreement by failing to establish the REA, this is not supported by the facts. The Agreement states that the REA will be entered at closing and be recorded immediately after the recordation of the deed. Agreement

---

[2] It is also worth noting that the Agreement itself contemplated that subdividing the property could take longer than the 270 days that the agreement gave to close on the property by expressly providing that the closing date could be extended until the subdivision was accomplished.

P1.C. The Agreement also provided a mechanism for the parties to follow if they could not agree on the terms of the REA. Specifically, the parties would have to submit the disagreement to binding arbitration within five days after the date of written notification of the disagreement. Agreement P1.C(1). While Defendant may have provided Plaintiffs with a proposed REA, the fact that no REA was entered and Plaintiffs did not respond does not constitute a breach of the Agreement. First, there was no evidence presented that Defendant or Plaintiffs objected to the REA in writing as contemplated in the Agreement. Second, no effort was made to follow the contract's arbitration provision. Finally, since the parties never closed on the property and the REA was to be entered at closing, Plaintiffs' failure to enter into a REA is not a breach of the contract's terms.

### Rule against Perpetuities

In this matter, it is undisputed that the Agreement states that, as a condition precedent to closing, the property in question must be sub-divided. Agreement P1. A. The Agreement further provides that, if the property is not sub-divided by the date of closing, "the date of Closing shall be extended day-for-day until Seller's [Plaintiffs'] subdivision and/or adjustment of property lines is approved." *Id*. Defendant argues that, since the closing date could theoretically be put off forever waiting for the property to be sub-divided, it violates the rule against perpetuities. While this would be true under the old common law rule, it is not the case under the modified rule adopted by Virginia.

The common law rule against perpetuities stated that when an interest is created it must vest within a life in being plus twenty-one years and ten months. *The Ryland Group, Inc. v. Wills, Trustee, etc., et al.*, 229 Va. 459, 463, 331 S.E.2d 399, 402 (1985). If the interest might not vest within that time period, the common law rule held that the interest was void *ab initio*. This harsh rule was modified by the Uniform Statutory Rule Against Perpetuities, adopted by Virginia, which provides that when an interest is created it must be certain to vest or terminate no later than twenty-one years after the death of an individual then alive or within ninety years after its creation. Va. Code § 55-12.1.

However, the Uniform Statutory Rule does not apply to a non-vested property interest that arises out of a non-donative transfer. These non-vested non-donative interests in property fail, "if the interest does not vest, if it ever vests, within the period of the common law rule against

perpetuities." Va. Code 55-13.3(A). This provision is commonly referred to as the "wait-and-see" statute. This means the court will examine whether or not the interest vests or fails within a life in being plus twenty-one years. Where the parties are corporate entities and "the parties do not contract with reference to a life or lives in being, 21 years from the date of the creation of the interest is the determinative period." *Lake of Woods Assoc. v. McHugh*, 238 Va. 1, 5, 380 S.E.2d 872, 873 (1989). In essence all the court needs to do is examine whether or not twenty-one years have passed and whether or not the interest has vested.

Defendant argues that the court must perform a "later look" to determine if the contingency has been met at the time when it becomes involved in the dispute, i.e. when the suit is filed. Defendant Bench Brief, p. 9. Thus, since the Motion for Judgment was filed on May 17, 2004, and the contingency had not yet been met, Defendant claims the closing date could be extended, theoretically forever, thus violating the rule. *Id*. This is a misinterpretation of the rule since, as stated above, the statute provides that the court should determine whether or not the time period has passed, in this case twenty-one years, and whether or not the interest has vested or failed to vest.

The facts in this case show that the property was in fact sub-divided and the subdivision plat was recorded, however late, on August 17, 2004. Given that the agreement was entered into on or about April 23, 2003, this is clearly within the twenty-one year period provided for by the "wait-and-see" statute, and there is no violation of the rule against perpetuities.

### Liquidated Damages

Finally, Defendant claims that the $400,000 in deposited funds operates as an unenforceable penalty, rather than reasonable liquidated damages. It is well settled in Virginia law that:

> when the actual damages contemplated at the time of the agreement are uncertain and difficult to determine with exactness and when the amount fixed is not out of all proportion to the probable loss, the amount is deemed to have been intended as enforceable liquidated damages. But where the damage resulting from a breach of contract is susceptible of definite measurement (as when the breach consists of failure to pay a sum of money) or where the stipulated amount would be

grossly in excess of actual damages, courts of law usually construe such a stipulation as an unenforceable penalty.

*Taylor v. Sanders*, 233 Va. 73, 75, 353 S.E.2d 745, 746-47 (1987) (citations omitted).

Defendant argues that Plaintiffs' damages were easily and readily measurable since they could ascertain the fees for survey/planning consultants that they expended to perform their duties under the contract. In fact, discovery disclosed that Plaintiffs paid $19,762.59 in surveyor/planner consultant fees. Defendant Bench Brief, p. 20. Therefore Defendant maintains the deposit of $400,000 is actually twenty times the actual damages suffered by Plaintiffs. However, the money Plaintiffs expended to comply with the Agreement is not the only damages sustained by Plaintiffs. Plaintiffs' damages also include the harder to determine value of taking the property off the market and foregoing other potential sales. These damages cannot be definitively measured and are uncertain and difficult to determine with exactness. Further, even though retrospectively Defendant may not wish to relinquish this sum, there appears to be no dispute that Defendant, a real estate developer, understood the provision and consented that the non-refundable amount, just over 2% of the purchase price, would go to the Plaintiffs unless Plaintiffs defaulted, for the Agreement otherwise provides for the refund of the money to Defendant.[3] *See, Brooks v. Bankson*, 248 Va. 197, 445 S.E.2d 473 (1994) (holding $24,500, or 10% of the purchase price, was a valid enforceable liquidated damages); *Taylor v. Sanders*, 233 Va. 73, 353 S.E.2d 745 (1987) ($3,000 promissory note held not to be disproportionate to the probable loss sustained by the seller as the result of the breach and was an enforceable liquidated damages on a contract $63,900 for real estate).

This court finds that Defendant committed the first material breach of the Agreement by failing to pay the deposits called for in the Agreement and never closing on the property. Defendant's breach made the deposits, which were to be applied to the purchase price of the property, Plaintiffs' property as liquidated damages. The $400,000 deposit should be released to Plaintiffs and Defendant's Counterclaim dismissed.

---

[3] The agreement specifically provides P2. F: "For purposes of this Agreement, the term "Nonrefundable" shall mean that the funds in question shall belong to Seller [Plaintiffs] solely and shall be retained by Seller unless either (i) Seller defaults or (ii) this Agreement specifically provides for a refund, in either of which case, the funds in question shall be promptly repaid to Buyer."