Present:  Hassell, C.J., Lacy, Keenan, Koontz, Lemons, and
Agee, JJ., and Russell, S.J.

CHARLES D. PARR, SR., ET AL.

v.  Record No. 032674      OPINION BY JUSTICE ELIZABETH B. LACY
                                            November 5, 2004
ALDERWOODS GROUP, INC., ET AL.


ALDERWOODS GROUP, INC., ET AL.

v.  Record No. 032726

CHARLES D. PARR, SR., ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
                    Rodham T. Delk, Jr., Judge

     The dispositive issue in these consolidated appeals is

whether certain contemporaneously executed contracts were

integrated for purposes of determining the enforceability of

provisions in some of the contracts after a party's default

under one of the contracts.

                          I.  FACTS

     For a number of years Charles D. Parr, Sr. and C.D. Parr,

Inc. d/b/a Hill Funeral Home (Parr, Inc.) operated a funeral

home business, the Hill Funeral Home, at 447 West Washington

Street in Suffolk.  The property was owned by Hill Underwood

Funeral Home, Inc. (Hill Underwood).  In 1995, Loewen Group

International, Inc. (Loewen) negotiated with Parr and Parr,

Inc. for the purchase of the Hill Funeral Home business.  The

negotiations culminated in the execution of four agreements on

November 27, 1995 between Loewen's designated buyer Mullins Holding Company (Mullins)[1], Parr, Parr, Inc., and Hill Underwood: the More Formal Asset Purchase Agreement (Asset Purchase Agreement), the Non Competition Agreement (Non-Compete Agreement), the Lease, and the Management Agreement. Pursuant to these agreements, Parr and Parr, Inc. sold the Hill Funeral Home business to Mullins. Hill Underwood leased the Hill Funeral Home property to Mullins and filed in the deed records of the City of Suffolk a memorandum of lease containing a covenant restricting the use of the property as a funeral home by persons other than Mullins without Mullins' consent. Parr began managing both the Hill Funeral Home and another funeral home in Suffolk, the Sidney F. Harrell Funeral Home, for Mullins.

The relevant portions of the agreements follow. The Asset Purchase Agreement provided that Mullins would purchase certain assets for a total price of $1,125,000. The identified assets included "a leasehold interest . . . and a restrictive covenant (with the terms and conditions contained in the Lease described in Paragraph 10 hereof which is to be entered into contemporaneously herewith)" and "covenants of [Parr, Inc.] and [Parr] not to compete with the business of Buyer." The purchase price included $100,000 payable under

---

[1] Mullins was a wholly-owned subsidiary of Loewen.

identical provisions in both the Asset Purchase Agreement and the Non-Compete Agreement.

Under Paragraph 8 of the Asset Purchase Agreement, Parr agreed to execute a management agreement with Mullins. The provision contained the employment terms and annual salary under the Management Agreement and agreements by Parr and Parr, Inc. to execute a covenant not to compete with Mullins. The consideration and the duration of such covenant were also recited. Paragraph 10 of the Asset Purchase Agreement set out the duration and conditions of the Lease, including a restrictive covenant that the leased property would not be used as a funeral home or service business except by Mullins or "its successors and assigns" without Mullins' written consent to the modification or termination of the restrictive covenant.

The Non-Compete Agreement expressly provided that it was a condition of the Asset Purchase Agreement and that for ten years from the closing date of the Asset Purchase Agreement or three years following the date of termination of "any employment, management, or consulting relationship" with Mullins, neither Parr nor Parr, Inc. would engage in the funeral business within a 35-mile radius of the Hill Funeral Home. As consideration, Mullins was to pay Parr and Parr, Inc. a total of $10,000 per year for ten years under terms

identical to those recited in and identified as an asset purchased in the Asset Purchase Agreement. Paragraph 16 of the Non-Compete Agreement stated that a continuing default by Mullins under the Asset Purchase Agreement or note executed pursuant to that agreement, if not cured, was "deemed" to be a default of the Non-Compete Agreement.

The Management Agreement provided that Parr would manage for Mullins both the Hill Funeral Home and the Sidney F. Harrell Funeral Home. The Management Agreement allowed Mullins to terminate Parr for cause if he materially breached any warranty or covenant contained in the Asset Purchase Agreement. The Management Agreement also contained the terms of a noncompetition agreement, the terms of which were identical to those contained in the Non-Compete Agreement and described in the Asset Purchase Agreement.

The Lease, in addition to the various provisions defining the rights and responsibilities of the lessor and lessee, provided for an initial one-year term and five optional one-year renewal periods, and specifying the rental payments, recited the restrictive covenant in language essentially identical to that contained in the Asset Purchase Agreement.[2] In Paragraph 15 of the Lease, Parr and Parr, Inc. guaranteed

---

[2] The restrictive covenant is only applicable to the first floor of the 447 West Washington Street property.

4

the landlord's obligations, including its obligations under the restrictive covenant.

In June 1999, Loewen filed for bankruptcy and, in November of that year, Mullins stopped making payments under the Asset Purchase and Non-Compete agreements. Parr submitted his resignation to Mullins on September 21, 2001. After the Lease ended by its terms in November 2001, Parr began to operate the Parr Funeral Home on the Hill Underwood property.

## II.  PROCEEDINGS

On January 14, 2002, Mullins and Alderwoods Group, Inc.[3] (collectively "Alderwoods") filed a bill of complaint seeking a temporary and permanent injunction against Parr and Parr, Inc. (collectively "Parr") to prohibit them from competing with Alderwoods and operating a funeral home on the Hill Underwood property.[4] Parr filed its answer asserting that Alderwoods materially breached the November 1995 agreements and, therefore, the noncompetition agreement was no longer in effect and the restrictive covenant should be declared null and void.

---

[3] Loewen changed its name to Alderwoods Group, Inc. effective in January 2002.

[4] It appears from the record that Hill Underwood Funeral Home, Inc. no longer exists, but Parr and Parr, Inc. were guarantors of the landlord's obligations pursuant to Paragraph 15 of the Lease.

The trial court entered an order in January 2002 temporarily enjoining Parr from competing with Alderwoods pursuant to the terms of the covenants not to compete in the Asset Purchase, Management, and Non-Compete agreements, and, subsequently, on Alderwoods' motion, held Parr in contempt for violating that temporary injunction. Following a hearing on Parr's motion to set aside the temporary injunction, the trial court held that the four agreements, "although separate, should be regarded as and constructed as parts of one transaction and as if parts of one and the same instrument." The trial court found that Alderwoods defaulted its payment obligation under the Asset Purchase Agreement and that the default constituted "a default in the non-competition provisions of all of the sub-agreements as well." Based on these findings, the trial court concluded that the likelihood that Alderwoods would succeed on the merits was "substantially diminished" and, accordingly, set aside the temporary injunction.

A hearing on the permanent injunction was held on June 27, 2003. At this hearing Alderwoods sought to enforce the noncompetition provision contained in the Management Agreement and the restrictive covenant contained in the Lease. Alderwoods argued that these two contracts were separate contracts and, because Alderwoods had fulfilled its

6

obligations under these non-integrated contracts, Parr should be required to comply with the noncompetition and restrictive covenants in those contracts.  Parr replied that because Alderwoods breached a provision of one of the contracts, it could not enforce any other provisions of the integrated contracts.

As relevant here, the trial court reaffirmed its earlier holding that the Management Agreement and Asset Purchase Agreement were integrated and that Alderwoods' default precluded enforcement of the noncompetition provisions of the Management Agreement.  The trial court also found, however, that the restrictive covenant in the Lease was valid and enforceable against "the specific defendants" in this case and entered an order enjoining Parr from using the Hill Underwood property for a funeral business.  We granted the petitions for appeal filed by both Parr and Alderwoods.[5]

In considering these consolidated appeals, we first note that Alderwoods did not assign error to the trial court's determination that it breached the Asset Purchase Agreement. Furthermore, there is no challenge to the trial court's determination that the breach of the Asset Purchase Agreement was also a breach of the Non-Compete Agreement.  Therefore, we

---

[5] We granted an appeal to only two of Parr's three assignments of error.

7

consider only whether the Management Agreement and the Lease are integrated or separate and independent contracts.

### III. DISCUSSION

In Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 541 S.E.2d 279 (2001), we recited the principles to be applied when considering whether separate documents should be treated as an integrated instrument. "Where a business transaction is based on more than one document executed by the parties, the documents will be construed together to determine the intent of the parties," id. at 152, 541 S.E.2d at 284 (quoting Daugherty v. Diment, 238 Va. 520, 524, 385 S.E.2d 572, 574 (1989)), and "[w]here two papers are executed at the same time or contemporaneously between the same parties in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." Countryside, 261 Va. at 151, 541 S.E.2d at 284 (quoting Oliver Refining Co. v. Portsmouth Cotton Oil Refining Corp., 109 Va. 513, 520, 64 S.E. 56, 59 (1909)); see Richmond Postal Credit Union, Inc. v. Booker, 170 Va. 129, 134, 195 S.E. 663, 665 (1938). When such contracts are construed as if the provisions were in a single instrument, the first party to materially breach the contract cannot enforce the provisions of the integrated contract. A breach is material if it is "a

8

failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Countryside, 261 Va. at 154, 541 S.E.2d at 285 (quoting Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 204 (1997)). We now apply these principles to the contracts at issue.

### A. The Management Agreement

Alderwoods asserts that the Management Agreement is a contract separate and apart from the Asset Purchase Agreement because it is not ambiguous, it is separate and distinct in its subject matter and consideration, the obligations are not interrelated, and the cross-references in the contracts do not require integration of the agreements.[6] Alderwoods suggests that unless the four agreements are part of a single transaction "courts should not read the writings together as one contract because the parties may have had more than one transaction in one day of the same general nature." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 626 (4th Cir. 1999).

---

[6] At oral argument before this Court, Alderwoods also argued that because the Non-Compete agreement contained a cross-default provision, the absence of such a provision in the other agreements evidenced an intent that no cross-default existed among the other agreements. Because Alderwoods raises this argument for the first time on appeal, we will not consider it. Rule 5:25; see Faulknier v. Shafer, 264 Va. 210, 218 n.6, 563 S.E.2d 755, 760 n.6 (2002).

9

Whether contemporaneously executed separate agreements should be construed as a single integrated contract depends on the facts of each case.  Here, the Management Agreement and Asset Purchase Agreement cross-referenced each other and certain provisions were recited in both agreements using identical language.  These references reflect the parties' knowledge and understanding of the interrelationship between the contracts and provide strong support for the proposition that the parties intended that the documents constitute a single transaction.

Furthermore, while the four contracts identified discrete acts required of the parties, when considered as a whole, they show that the result and, therefore, presumably the purpose of the transaction was the elimination of competition between the funeral home interests held by Alderwoods and by Parr.  The transaction required Alderwoods' ownership of Parr's funeral business interests and Parr's management of Alderwoods' funeral business interests — the Hill Funeral Home and the Sidney F. Harrell Funeral Home.[7]  The provisions of the Management Agreement could not be performed without Alderwoods' acquisition of the Hill Funeral Home assets and a lease of the Hill Underwood property.  The purchase of the

_____

[7] The precise nature of Alderwoods' interest in the Sidney F. Harrell Funeral Home is not clear from this record.

10

Hill Funeral Home assets alone would not eliminate the competition by Parr without the noncompetition and restrictive covenant agreements. The absence of any one of the agreements would frustrate the purpose of the transaction. On this record, we conclude that the parties intended to effectuate a single transaction which required execution of all the agreements.

Accordingly, the trial court did not err in concluding that the Management Agreement and the Asset Purchase Agreement were part of an integrated contract. We will affirm the trial court's judgment holding the noncompetition provision of the Management Agreement was unenforceable because Alderwoods breached the Asset Purchase Agreement when it defaulted its payment obligations under that Agreement.

## B. The Lease

Parr asserts that the trial court erred in enforcing the restrictive covenant contained in the Lease because, like the Management Agreement, the Lease was part of an integrated contract. Parr argues he was relieved of any obligation to comply with the restrictive covenant because of Alderwoods' default of the Asset Purchase Agreement. Alderwoods replies that the Lease was a separate contract and not integrated with the other contemporaneously executed contracts, raising the same arguments put forth regarding the Management Agreement:

the Lease was not ambiguous; it was separate and distinct in its subject matter and consideration; the obligations were not interrelated; and the cross-references in the contracts did not require integration of the agreements. Alderwoods, relying on Bayside Corp. v. Virginia Super Food Fair Stores, Inc., 203 Va. 908, 128 S.E.2d 263 (1962), also argues that because it had fully performed its obligations under the Lease, it was entitled to enforce the restrictive covenant in the Lease even though by its terms the Lease had expired.

We reject Alderwoods' arguments that the Lease was a separate contract. First, like the Management Agreement, there were significant cross-references between the Asset Purchase Agreement and the Lease. The Asset Purchase Agreement listed the Lease as "an asset" purchased. The material terms of the restrictive covenant in the Lease were also recited in the Asset Purchase Agreement. And, as we have already discussed, the transaction's purpose of eliminating competition between Parr and Alderwoods' interests in the funeral home business could not be accomplished without execution of all four agreements. Therefore, we hold that the Lease was not a separate contract but, like the Management Agreement, was integrated with the Asset Purchase Agreement. Assuming without deciding that the restrictive covenant in this case would be enforceable absent a breach of the

12

integrated contracts here, the restrictive covenant is not enforceable against Parr, because Alderwoods breached a material provision of the integrated contract.

Neither the expiration of the lease nor our conclusion in Bayside require a different result. The lease in Bayside included a provision prohibiting the landlord from leasing any space in a shopping center to a competitor of the lessee for three years after the lessee terminated the lease. Bayside, 203 Va. at 910, 128 S.E.2d at 265. This Court enforced that provision even though the lease had been terminated, finding that the covenant was a reasonable personal covenant. Id. at 911, 128 S.E.2d at 266.

In Bayside, unlike this case, neither the landlord nor the lessee defaulted under the lease. The Bayside lease provided that the lessee could terminate the lease if the landlord failed to meet certain conditions. Id. at 910, 128 S.E.2d at 265. The landlord failed to meet the conditions and the lessee terminated the lease. Id. The landlord's inability to meet the conditions was not a breach of the lease, but a circumstance which the parties anticipated and addressed by allowing the lessee to terminate the lease. In the absence of a default or breach, a reasonable personal covenant contained in the lease was enforceable.

13

Like Bayside, the instant case involves an agreement restricting the use of the land as a term of the lease agreement. Unlike Bayside, however, the instant case involves a breach or default by one of the parties which precluded the defaulting party from enforcing the remaining provisions of the integrated contract. Consequently, Bayside is not the controlling precedent here.

IV. CONCLUSION

Because we hold that Alderwoods' breach of the integrated contract relieved Parr of any obligation under the restrictive covenant, we need not address Parr's assignment of error challenging the trial court's holding that the restrictive covenant was a valid covenant.

Accordingly, for the reasons stated, we will affirm that portion of the trial court's judgment holding that the covenants not to compete are unenforceable and we will reverse that portion of the trial court's judgment enforcing the restrictive covenant of the lease.

Affirmed in part,
reversed in part,
and final judgment.

14