**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2385

MINNIELAND PRIVATE DAY SCHOOL, INC., a Virginia corporation,

Plaintiff - Appellee,

v.

APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:15-cv-01695-AJT-IDD)

Argued: October 30, 2018                           Decided: January 14, 2019

Before GREGORY, Chief Judge, MOTZ, and WYNN, Circuit Judges.

Affirmed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Motz and Judge Wynn joined.

**ARGUED:** Daniel William Olivas, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Nashville, Tennessee, for Appellant. James Scott Krein, KREIN LAW FRIM, Prince William, Virginia, for Appellee. **ON BRIEF:** R. Dale Bay, Ryan N. Clark, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Nashville, Tennessee, for Appellant.

GREGORY, Chief Judge:

Appellant Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA") comes to us for the second time in this case, appealing the district court's determination that a Reinsurance Participation Agreement ("RPA") executed by it and Appellee Minnieland Private Day School is an insurance contract under Virginia law. The RPA, executed in connection with Minnieland's purchase of workers' compensation insurance, contains an arbitration clause. In the district court, AUCRA moved to compel arbitration in accordance with the RPA's terms. In opposing arbitration, Minnieland asserted that the RPA is an insurance contract for purposes of Virginia Code § 38.2–312, which renders void arbitration clauses contained in insurance contracts. The district court denied AUCRA's motion to compel arbitration, finding that AUCRA was judicially estopped from arguing that the RPA is not an insurance contract. We reversed that determination, concluding that AUCRA was not estopped from making its argument, and remanded to allow the parties to brief fully the issue of whether the RPA is an insurance contract for purposes of Virginia Code § 38.2–312. On remand, the district court held that the RPA is indeed an insurance contract and that the RPA's arbitration clause is void as a matter of law. AUCRA now appeals that determination.

For the reasons set forth below, we conclude that the RPA is an insurance contract for purposes of Virginia Code § 38.2–312. We therefore affirm.

I.

A.

This case involves a workers' compensation insurance program that Minnieland purchased from AUCRA and its affiliated entities. Under Virginia law, workers' compensation insurance is "insurance against the legal liability of any employer for the death or disablement of, or injury to, his or its employee whether imposed by common law or by statute, or assumed by contract." Va. Code § 38.2–119. Workers' compensation insurance coverage is required of "[e]very employer subject to" Virginia's workers' compensation statute. Va. Code § 65.2–800(A); *Redifer v. Chester*, 720 S.E.2d 66, 67–68 (Va. 2012).

In general, workers' compensation insurance is typically provided in one of two types of policies: a guaranteed cost policy or a retrospective rating plan. Under a guaranteed cost policy, the premiums are fixed and usually do not change over the term of the policy. Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt, 2 Couch on Insurance § 69:10 (3d ed. 1995). In many states, these plans are the only plans lawfully available to small and mid-sized employers. Retrospective rating plans, on the other hand, usually require an advance premium deposit with the insurer and then provide that the insurer, at some specified time, will compute the actual premium based on the insured's actual loss experience or total payroll during a set period of time. *Id.* § 69:16; *see* Va. Code § 38.2–1901 (defining "retrospective rating plan" as "a rating plan that adjusts the premium for the insurance to which it applies on the basis of losses incurred during the period covered by that insurance"). The insured is then either issued a refund

3

if the actual premium is lower than the premium deposit paid or required to pay the difference if the actual premium exceeds the deposited amount.

At issue in this appeal is Applied Underwriters, Inc.'s EquityComp program, an innovative program of workers' compensation insurance that offers small and mid-sized employers the benefits of both a guaranteed cost policy and a retrospective rating plan in one insurance program. The EquityComp program provides employers with guaranteed cost workers' compensation insurance at the same time that they enjoy the benefits—and are subject to the risks—of a retrospective rating plan. *See* J.A. 404 (explaining that this RPA allows small and mid-sized employers to "in effect, have a retrospective rating plan . . . even though, in fact, the insured has Guaranteed Cost insurance coverage with the insurance carrier").[1] The program is so novel that it has been patented.

Under the program, various insurance companies affiliated with Applied Underwriters, Inc. have entered into a reinsurance pooling agreement. The pooled companies provide workers' compensation insurance coverage to employers and also mutually reinsure each other's insurance business. A layer of reinsurance is also provided by AUCRA, a wholly owned subsidiary of Applied Underwriters, Inc. AUCRA in turn enters into RPAs with EquityComp customers, under the terms of which each customer pays into a segregated "cell" or account that is then used to fund AUCRA's liabilities. In essence, EquityComp customers participate in underwriting the risk of their own workers' compensation insurance policies.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

In theory, an EquityComp customer can save costs on its workers' compensation insurance through a refund of monies deposited into its segregated cell if its workers' compensation insurance claims are kept low during the term of the RPA. As detailed below, however, Minnieland was unable to reap this benefit.

B.

Minnieland provides education and childcare services in Virginia and is subject to the workers' compensation laws and requirements of the state. Va. Code § 65.2–800(A).

On January 14, 2013, Minnieland bought into the EquityComp program. Minnieland executed a Request to Bind Coverages and Services ("Binder"), by which Minnieland "request[ed] that Applied Underwriters, Inc. through its affiliates and/or subsidiaries . . . cause to be issued to [Minnieland] one or more workers' compensation insurance policies . . . subject to [Minnieland] executing the . . . [RPA]." J.A. 40. At the same time, Minnieland executed an RPA. The RPA had a term of three years and provided that one or more "Issuing Insurers"—all of which were entities affiliated with Applied Underwriters, Inc.—would issue workers' compensation insurance policies to Minnieland. The RPA also established that Minnieland would share in the profits and losses associated with its policies through its "segregated protected cell." Applied Risk Services, Inc. ("ARS"), another subsidiary of Applied Underwriters, Inc., was designated as the billing agent for both AUCRA and the Issuing Insurers. Schedule 1 of the RPA sets forth various formulae for calculating premiums and losses under the RPA and insurance policies.

The day after Minnieland executed the EquityComp documents, the RPA went into effect, as did the first of what would become three consecutive one-year Virginia workers' compensation insurance policies, the last of which was to expire on January 15, 2016. The first policy listed the estimated annual premium as $589,163. The second and third policies listed the estimated annual premiums as $642,333 and $706,160, respectively. The policies were produced by ARS and insured by Continental Indemnity Company ("CNI"), another affiliate of Applied Underwriters, Inc.

According to the complaint, at no time was AUCRA licensed to sell insurance in Virginia, and the RPA has not been approved by the Virginia Workers' Compensation Commission.

For the first 33 of the 36 months during which the RPA was active, AUCRA charged, and Minnieland paid, an average of $58,810 per month in premiums. In November 2015, however, the premium charged to Minnieland increased drastically to $471,213, a 1167% increase from the October 2015 premium and a 801% increase over the first 33 months' average. Despite Minnieland's requests, AUCRA refused to disclose the basis on which it assessed the November 2015 premium. Minnieland nonetheless paid the November premium.

AUCRA billed Minnieland a similarly high premium of $414,604 for December 2015. AUCRA once again refused to disclose the basis for the increased premium, and Minnieland did not pay the December premium.

6

On December 16, 2015, AUCRA[2] faxed Minnieland notice that it was terminating Minnieland's EquityComp program, including the RPA and insurance coverage, effective December 27, 2015. The reason provided for the termination of coverage was "Non-Payment of Premium; Client has an outstanding balance."

C.

On December 24, 2015, Minnieland filed suit against AUCRA in the Eastern District of Virginia. Minnieland alleged that AUCRA is not authorized or licensed to act as an insurance company under Virginia law; that the RPA is an "insurance contract" and not a "reinsurance" agreement; and that AUCRA misrepresented the EquityComp program, and the RPA specifically, to circumvent Virginia insurance and workers' compensation laws. Minnieland sought (1) a declaration that the RPA constitutes an insurance contract and is void because of AUCRA's failure to comply with Virginia law; (2) a declaration of the amount, if any, that Minnieland owes under the RPA; and (3) a declaration that the premiums, deposits, and charges assessed to Minnieland by AUCRA were excessive. Minnieland also sought damages for fraud and breach of contract.

On January 18, 2016, AUCRA filed a demand for arbitration with the American Arbitration Association, invoking the RPA's arbitration provisions. That demand sought payment from Minnieland of a total of $342,358 that AUCRA claimed it was owed under the RPA and EquityComp program.

---

[2] The complaint alleges that AUCRA sent the notice. The letter is printed on "Applied Underwriters" letterhead and does not specify if the sender is AUCRA or Applied Underwriters, Inc. J.A. 52. The document attached to the letter indicates that it was "produced by" ARS. J.A. 53.

AUCRA also moved the district court to dismiss Minnieland's complaint and compel arbitration under the RPA's arbitration clause. In opposing the motion to compel arbitration, Minnieland argued that the RPA is an insurance contract. As such, Minnieland argued, the arbitration clause is void because it is prohibited by Virginia Code § 38.2–312.

On March 17, 2016, the district court granted in part and denied in part AUCRA's motion. The district court determined that the RPA's arbitration clause calls for arbitration of the threshold question of whether the RPA is an insurance contract such that Virginia's insurance statute, which reverse-preempts the Federal Arbitration Act ("FAA"), applies. Accordingly, the court ordered the parties to submit that question to the arbitrator.

A week later, the district court granted Minnieland's motion for reconsideration of the court's March 17, 2016 order. The district court again concluded that the threshold issue of arbitrability was for the arbitrator to determine. The district court nonetheless stayed its March 17 order and requested supplemental briefing on Minnieland's contention that AUCRA was judicially estopped from arguing that the RPA is not an insurance contract.

The parties briefed the judicial estoppel issue, and the district court heard argument on AUCRA's motion to compel arbitration. The district court denied the motion to compel, concluding that the four elements of judicial estoppel were met such that AUCRA was estopped from arguing that the RPA is not an insurance contract. *See*

*Lowery v. Stovall*, 92 F.3d 219, 223–24 (4th Cir. 1996) (discussing the elements of judicial estoppel).

AUCRA appealed that order. On appeal, we affirmed in part and reversed in part. *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 926 (2018). We concluded that Virginia Code § 38.2–312 "renders invalid delegation provisions in putative insurance contracts governed by Virginia law, at least to the extent such delegation provisions endow an arbitrator, as opposed to a court, with exclusive authority to determine whether the contract at issue constitutes an 'insurance contract' for purposes of Virginia law." *Id.* at 456. Therefore, we affirmed the district court's denial of the motion to compel arbitration. *Id.* at 457. We also concluded that AUCRA was not judicially estopped from arguing that the RPA is not an insurance contract under Virginia law. *Id.* at 458–59. Because the parties had not had the opportunity to brief fully the issue of whether the RPA is an insurance contract under Virginia law, we remanded the matter to the district court. *Id.* at 459.

On remand, the district court ruled in an oral opinion that the RPA is an insurance contract. As the district court explained:

> Under this arrangement, Minnieland and AUCRA entered into a contract as a result of which Minnieland received workmen's compensation coverage through an insurance policy in exchange for premiums that were paid for that coverage.
>
> AUCRA's position rests entirely on parsing this transaction to the point of being completely disassociated with the realities of the overall transaction. So the Court

9

concludes that it's an insurance contract for the purposes of 38.2–312 as the Fourth Circuit has already determined.[3]

J.A. 1073–74. Accordingly, the district court denied the motion to compel arbitration, finding that "any arbitration provisions pertaining to any disputes under [the RPA] are void." J.A. 1074.

AUCRA appeals the district court's denial of its motion to compel arbitration.

## II.

We review de novo a district court's order denying a motion to compel arbitration under the FAA. *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 605 (4th Cir. 2013). "At the same time, we give due regard to the federal policy favoring arbitration and resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (citation omitted).

In determining whether a dispute is arbitrable, we "apply ordinary state-law principles that govern the formation of contracts and the federal substantive law of arbitrability." *Id.* (internal citations and quotation marks omitted). Because this matter

---

[3] In our prior opinion, we did not determine that the RPA is in fact an insurance contract. Rather, we affirmed the district court's denial of AUCRA's motion to compel arbitration on the grounds that Virginia Code § 38.2–312 "renders void delegation provisions in putative insurance contracts—at least to the extent such provisions authorize an arbitrator to resolve whether the contract at issue constitutes an 'insurance contract.'" *Minnieland*, 867 F.3d at 457. Recognizing that the parties had not had the opportunity to brief and argue the issue of whether the RPA is an insurance contract under Virginia law, we remanded this matter to the district court for consideration of that issue.

10

involves the question of whether the RPA is an insurance contract for purposes of the Virginia Code, we look to Virginia law, which the parties agree applies in this case.[4]

III.

A.

We begin by addressing AUCRA's argument that the district court ignored this Court's "narrow" mandate and improperly considered the entire program of workers' compensation insurance—rather than only the RPA—in determining that the RPA is an insurance contract under Virginia law. Opening Br. 23–26. AUCRA points out that the complaint names only AUCRA as a defendant, not CNI (the policy issuer), Applied Underwriters, Inc. (the parent company), or Applied Risk Services (the billing agent). *Id.* at 25 (citing J.A. 1). AUCRA also relies on the fact that Minnieland's claims are predicated on the RPA alone. *Id.* (citing J.A. 11–22). In light of this narrow focus of Minnieland's suit and our "narrow mandate" to determine whether "the RPA is an insurance contract under Virginia law," AUCRA asserts that the district court should

---

[4] We note that the RPA provides that it "shall be exclusively governed by and construed in accordance with the laws of Nebraska and any matter concerning this Agreement that is not subject to [arbitration] shall be resolved exclusively by the courts of Nebraska without reference to its conflict of laws." J.A. 34 (§ 16). The question of whether the contract itself is an insurance contract for purposes of Virginia Code § 38.2–312, however, is a matter of Virginia law, and both parties brief the issue on appeal under Virginia law. *See, e.g.*, Opening Br. 28–34; Resp. Br. 13, 18–22. Because the parties agree that Virginia law applies, we need not inquire further into the choice-of-law questions, and Virginia law controls the analysis. *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 169 n.7 (4th Cir. 2013) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)). We also note that AUCRA has not invoked the RPA's forum selection clause.

11

have considered only the RPA, not the workers' compensation insurance transaction as a whole. *Id.* at 25–26.

Nothing in our prior opinion suggests that we intended to preclude any evaluation of whether the RPA's terms are the complete terms of the parties' agreement or whether the RPA's terms should be construed as integrated with the terms of the other EquityComp agreements. Our mandate was indeed limited to the RPA. However, on the previous appeal, we were concerned only with the RPA because the RPA contains the arbitration provision at issue. Because we remanded for consideration of whether the RPA is an "insurance contract" under Virginia law, the district court was faced with the initial question of whether the RPA is in fact a standalone contract or is simply one part of an integrated contract. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 626 (4th Cir. 1999) ("A contract may be contained in several instruments, and they may be read together as one instrument [i]f made at the same time and in relation to the same subject matter." (alteration in original) (internal citations and quotation marks omitted)). Only after the court made that threshold determination could it then determine the nature of the contract. Therefore, the district court did not ignore our previous mandate by looking at the EquityComp program as a whole.

B.

1.

Having concluded that the district court did not violate our prior mandate, we turn to the issue at the heart of this appeal: whether the RPA is an insurance contract for purposes of Virginia Code § 38.2–312. Under Virginia law, "[w]here two papers are

12

executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 284 (Va. 2001) (alteration in original) (citations omitted). "To construe two instruments as one, reference in one instrument to the other need not be explicit; 'it is sufficient if it is fairly traceable.'" *Hitachi Credit*, 166 F.3d at 626 (quoting *Tex. Co. v. Northup*, 153 S.E. 659, 662 (Va. 1930)). While "a court is not required to construe two documents as one contract just because they are executed at the same time and concern the same subject matter[,] [t]he court must give effect to the intent of the parties." *Id.* (citing *Am. Realty Tr. v. Chase Manhattan Bank, N.A.*, 281 S.E.2d 825, 831 (Va. 1981)).

The Virginia courts have yet to address whether a contract similar to the RPA, executed during an insurance transaction, comprises part of the insurance contract. The Virginia Supreme Court, however, has taken a rather expansive view of what constitutes a single integrated contract. In *Daugherty v. Diment*, the Virginia Supreme Court made clear that, "[w]here a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties; each document will be employed to ascertain the meaning intended to be expressed by the others." 385 S.E.2d 572, 574 (Va. 1989) (citing *Am. Realty Tr.*, 281 S.E.2d at 830).

The Virginia Supreme Court has since applied *Daugherty*'s rule regularly to transactions involving multiple written agreements. In *Musselman v. Glass Works, LLC*,

13

for example, the Virginia Supreme Court held that an asset purchase agreement and a non-competition agreement executed at the same time "formed an integrated business transaction." 533 S.E.2d 919, 921 (Va. 2000). The purchase agreement provided that the purchase price was payable in various payments, including a deposit, a sum certain at closing, a secured promissory note to the sellers, and a total of $60,000 to be paid pursuant to three non-competition agreements. *Id.* at 920. The Virginia Supreme Court rejected an argument that the non-competition agreements were separate, personal service contracts. *Id.* at 921. Instead, the court determined that the four contracts formed an integrated contract because the sum due under the non-competition agreements was explicitly part of the purchase price of the business under the purchase agreement. *Id.*

The Virginia Supreme Court has also found that agreements not executed by the same parties may nonetheless constitute an integrated contract. In *Countryside Orthopaedics*, for instance, the court found an integrated contract comprised of four agreements: two employment agreements executed by Countryside Orthopaedics and two respective physicians, a Stock Purchase Agreement executed by the physicians, and a Stockholders' Agreement executed by all three parties. 541 S.E.2d at 284. The court held that these documents constituted a single transaction despite the fact that each of the contracts was not signed by all three parties because "all the parties knew about the agreements and executed them at the same time as part of a single transaction to accomplish an agreed purpose." *Id.* The court was also persuaded by the fact that "some of the agreements contain[ed] explicit references to the other agreements." *Id.* at 285.

14

Also instructive is *Parr v. Alderwoods Grp., Inc.*, 604 S.E.2d 431 (Va. 2004). The transaction at issue in that case involved four agreements: an asset purchase agreement, a non-competition agreement, a lease, and a management agreement. *Id.* at 432. In reviewing the agreements, the Virginia Supreme Court rejected the argument that the management agreement was "a contract separate and apart from" the asset purchase agreement. *Id.* at 435. The court found that the management agreement and asset purchase agreement should be construed "as a single integrated contract" because they cross-referenced each other and contained certain provisions written in identical language. *Id.* The court explained that those references "reflect[ed] the parties' knowledge and understanding of the interrelationship between the contracts and provide[d] strong support for the proposition that the parties intended that the documents constitute a single transaction." *Id.* The court further reasoned that, although the four contracts "identified discrete acts required of the parties," the contracts all shared the same result and purpose. *Id.* Also relevant was the fact that the provisions of the management agreement "could not be performed" without the acquisition of the business through the purchase agreement and the lease of the property. *Id.* As the court stated, "[t]he absence of any one of the agreements would frustrate the purpose of the transaction." *Id.*

Moreover, it is well-established that insurance may be sold and purchased by way of more than the pages of the policy itself. *See* 2 Couch on Insurance § 21:21 ("Endorsements, riders, marginal references, and other similar writings are a part of the contract of insurance and are to be read and construed with the policy proper."). Counsel

15

for AUCRA conceded during oral argument that an insurance contract is broader than an insurance policy and that a policy endorsement, for example, would be considered part of the insurance contract.

2.

With these principles in mind, we examine the relationship between the Binder, RPA, and the CNI workers' compensation insurance policies. Both the RPA and the first CNI policy went into effect on the same day, one day after Minnieland executed the Binder and RPA. Issuance of the policy was expressly conditioned on Minnieland's prior execution of the RPA. Therefore, as contemplated by the parties, execution of the RPA would temporally precede issuance of the insurance policy. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004) ("Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." (citation omitted)). And the entire program went into effect at the same time, on January 15, 2013.

The subject matter of the documents is also the same: the workers' compensation insurance issued to Minnieland, including the manner in which the payroll, premiums, and losses in connection with the insurance coverage would be calculated and how the risk would be distributed. The Binder represented Minnieland's acceptance of the EquityComp program, and through the Binder, Minnieland requested that Applied Underwriters, Inc. "through its affiliates and/or subsidiaries . . . cause to be issued" workers' compensation insurance coverage to Minnieland. J.A. 40. The RPA also discusses the insurance coverage; it notes that workers' compensation insurance coverage

16

"will be provided" to Minnieland by "one or more of the Issuing Insurers," defined as affiliates of Applied Underwriters, Inc. J.A. 30–31. The RPA establishes Minnieland's participation in a segregated cell to be funded in part by "a portion of the premium and losses" under the RPA. J.A. 30. The premium and losses are calculated pursuant to the RPA's Schedule 1. *Id.* And Schedule 1 "applies . . . to all payroll, premium, and losses occurring under the [CNI workers' compensation insurance] Policies." J.A. 36.

The documents also internally reference each other and set forth each other's terms. The Binder formally requests the issuance of workers' compensation insurance coverage subject to Minnieland's execution of the RPA. The RPA references the workers' compensation policies explicitly, and Minnieland was required to execute the RPA before those policies would issue. Schedule 1 of the RPA establishes the manner in which Minnieland's fees for the EquityComp program as a whole would be calculated. That is, Schedule 1 applies to all premiums and losses under the actual insurance policies. In fact, the billing statements for Minnieland's participation in the EquityComp program show that Minnieland was charged a single "pay-in amount" each month for the "Workers' Compensation *Program*." J.A. 45, 47, 49 (emphasis added). The RPA also waives Minnieland's right to choose deductibles for its workers' compensation insurance policies, and the Binder acknowledges that waiver. *See* J.A. 31 (§ 5), 40.

The RPA and insurance policies are linked in other ways as well. The RPA provides that its early cancellation terms apply if any one of the insurance policies is cancelled prior to the end of the RPA's three-year term. J.A. 31 (§ 4). The RPA also provides that Minnieland and AUCRA's obligations under the RPA survive the active

17

term of the RPA "and shall be extinguished only when [AUCRA] no longer has any potential or actual liability to the Issuing Insurers with respect to the [workers' compensation insurance] Policies." J.A. 31 (§ 7). The RPA additionally provides that, in the event Minnieland defaults under the RPA "or under any other agreement with any affiliates of [AUCRA] (Affiliated Agreements)," AUCRA "may take all reasonable steps to protect its and its affiliates' interests." J.A. 31 (§ 9). The RPA goes on to state that "[t]he parties hereto shall have the right . . . to offset or recoup any balances due from one to the other under [the RPA] or any Affiliated Agreements." *Id.* Those Affiliated Agreements would include the insurance policies issued by CNI, an AUCRA affiliate. The RPA also sets forth the terms that apply if CNI were required to provide workers' compensation insurance coverage outside of the active term of the RPA. J.A. 31 (§ 4).

These explicit internal references, interrelated terms, and shared subject matter are strong evidence that the parties intended these documents to be part of one integrated transaction. *See Countryside Orthopaedics*, 541 S.E.2d at 285; *Musselman*, 533 S.E.2d at 921.

To be sure, the documents were not executed by the same parties. The Binder was signed by Minnieland as an acceptance of the EquityComp program proposal apparently drafted by ARS, a subsidiary of Applied Underwriters, Inc., to whom the EquityComp trademark is registered. *See* J.A. 23 (defining "we" as Applied Risk Services). The RPA was executed between Minnieland and AUCRA, another subsidiary of Applied Underwriters, Inc. J.A. 30. And the insurance policies were produced by Applied Risk

18

Services, Inc., another subsidiary of Applied Underwriters, Inc., with CNI, yet another Applied Underwriters, Inc. subsidiary, as the insuring entity. J.A. 42–44.

Nonetheless, the EquityComp program is promoted and sold as "*[o]ne unified program* for your business needs across all states" provided by Applied Underwriters, Inc., "a premier financial services *group of companies* with leading experience in the casualty insurance, reinsurance and business services disciplines." J.A. 24–25 (emphases added). The EquityComp program is marketed as being "effected through a separate reinsurance transaction issued in conjunction with a fully insured, guaranteed cost, workers' compensation policy." J.A. 24. In fact, the Producer's Quote Transmittal sent to the agent who brokered this deal for Minnieland expressly stated that the program proposed to Minnieland was "valid only if presented prior to expiration, in its original form, *and in its entirety without modification*." J.A. 29 (emphasis added). And the Binder makes clear that insurance coverage was conditioned on execution of the RPA. Therefore, absent execution of the RPA, the insurance coverage would not have been offered as proposed. *See Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 239 F. Supp. 3d 761, 786 (S.D.N.Y. 2017) (examining the workers' compensation insurance program offered by AUCRA and its affiliates and noting that the RPA "would serve no purpose" without the approved guaranteed cost insurance policies and that "it is plausible that the two can be treated as one undertaking"); *see also Parr*, 604 S.E.2d at 435 (finding integrated contract where one contract's terms could not be performed in the absence of other contracts).

Additionally, the RPA contemplates that its terms will apply to AUCRA's affiliates. The RPA provides that "[n]othing in this Agreement, expressed or implied, is intended to confer upon any party, *other than the parties hereto and their affiliates, successors and assigns*, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein." J.A. 35 (§ 19) (emphasis added). The RPA also provides that "[a]ll existing obligations from each party to the other *or to third parties* shall remain in force as of the expiration of the Active Term until this Agreement is terminated." J.A. 31 (§ 4) (emphasis added). These provisions further suggest that Minnieland and AUCRA intended the RPA to be part of an integrated transaction with AUCRA's affiliates. *See Countryside Orthopaedics*, 541 S.E.2d at 284.

During oral argument, counsel for AUCRA highlighted that, despite the RPA's Schedule 1, the RPA does not charge "premiums"; it merely explains what happens to the premiums that are paid under the policies. This, however, does not render the RPA a standalone contract. Instead, it lends support to Minnieland's argument that the RPA and the CNI policies must be read as one integrated contract. The policies set forth an estimated annual premium that is not subject to the RPA's Schedule 1 calculations. J.A. 42–44. The policies also contain a Short Rate Cancelation Policyholder Notice that explains how the final premium will be calculated if the policies are cancelled by Minnieland. J.A. 761–63. The RPA's Schedule 1, on the other hand, purports to establish the total fee to be paid by Minnieland for the EquityComp program as well as any early cancellation fee that may be due. J.A. 36–37.

20

Schedule 1's calculations, however, incorporate the provisions of the CNI policies. Schedule 1 states that it "applies as of the Effective Date [January 15, 2013] to all payroll, premium, and losses occurring under the Policies." J.A. 36. Schedule 1 explains that "[a]n amount equal to the premium earned under the Policies in excess of the Loss Pick Containment Amount multiplied by the applicable Exposure Group Adjustment Factor multiplied by the Allocation Factor listed in Table B, will be allocated to the Participant's cell." J.A. 36 (§ 2). Thus, although Minnieland was billed one monthly fee for the EquityComp program, the premium amount set forth in the policies was part of that monthly fee and was included in calculating the total amount that would be due under the program as a whole. Absent the CNI policies, the calculations in Schedule 1— including the amount to be allocated to Minnieland's segregated cell—would be impossible to make.

The early cancellation provision of the RPA also depends on the cancellation provisions of the CNI policies. The RPA's early cancellation provision applies if either Minnieland cancels the RPA or if any of the insurance policies are "cancelled or non-renewed prior to the end of the Active Term" of the RPA. J.A. 31 (§ 4). That cancellation policy, described in Schedule 1, states that certain of the factors used to calculate premiums and losses will be increased in the event of early cancellation and that Minnieland will be required to pay, among other things, "any remaining premium, *including short rate penalties*, due under the Policies." J.A. 37 (§ 6) (emphasis added). Those "short rate penalties" are the early termination provisions of the insurance policies. *See, e.g.*, J.A. 761 ("Short Rate Cancelation Policyholder Notice"). And the short rate

21

penalties apply when the policy is cancelled by Minnieland. *Id.* Therefore, when the short rate cancellation provisions of the policies apply, they are another integer of the formula used under the RPA to calculate the total amount due under the EquityComp program. In the absence of the CNI policy terms, the RPA's Schedule 1 calculations and early cancellation provisions make no sense. *See Musselman*, 533 S.E.2d at 921.

We do not ignore that Minnieland chose to sue only AUCRA and to base its claims only on the RPA. However, because the RPA was but one component of an integrated insurance sale, we must examine the related documents and the relationship between the affiliated entities. *Daugherty*, 385 S.E.2d at 574. In the absence of the CNI policies, the RPA would have been pointless and nonsensical; and in the absence of the RPA, there would have been no insurance coverage. Nothing in the record suggests that Minnieland could have simply paid the premiums listed in the CNI policies, without paying the amounts set forth in the RPA's Schedule 1, and maintained its workers' compensation coverage; the RPA expressly provides for the opposite result. Because the EquityComp program was marketed and sold as a package deal, Minnieland's failure to execute the RPA would have frustrated the purpose of the transaction. *See Parr*, 604 S.E.2d at 435.

In sum, the documents, considered together, show that the purpose of the Binder, RPA, and CNI policies was one: to provide Minnieland with workers' compensation insurance coverage while allowing Minnieland the opportunity to keep its insurance costs low by sharing in the underwriting risk. We need not determine specifically whether the RPA constitutes a policy endorsement or rider. Regardless of the label that may attach,

22

the RPA and insurance policies constitute an integrated transaction and must be read as one contract.

C.

Having determined the scope of the contract at issue, we must now decide whether the integrated contract is a contract of insurance under Virginia Code § 38.2–312. The Virginia Code does not define "insurance contract." It does define "insurance," however, as "the business of transferring risk by contract wherein a person, for a consideration, undertakes (i) to indemnify another person, (ii) to pay or provide a specified or ascertainable amount of money, or (iii) to provide a benefit or service upon the occurrence of a determinable risk contingency." Va. Code § 38.2–100. The Code also lists the required terms of "[e]ach insurance policy or contract":

1. The names of the parties to the contract;

2. The subject of the insurance;

3. The risks insured against;

4. The time the insurance takes effect and, except in the case of group insurance, title insurance, and insurance written under perpetual policies, the period during which the insurance is to continue;

5. A statement of the premium, except in the case of group insurance and title insurance; and

6. The conditions pertaining to the insurance.

Va. Code § 38.2–305.[5]

---

[5] Minnieland cites to Virginia common law for the essential terms of an insurance contract. *See* Resp. Br. 20–21; *Grp. Hospitalization Med. Serv., Inc. v. Smith*, 372 S.E.2d (Continued)

Neither party argues that the terms of the CNI policies themselves fail to meet the statutory requirements for insurance contracts. In fact, AUCRA acknowledges that the CNI policies meet Virginia's requirements. Opening Br. 7 n.3. Construing the CNI policy terms as integrated with those of the RPA, as though the terms of each were written in a single document, *Countryside Orthopaedics*, 541 S.E.2d at 284, it becomes clear that the contract at issue is an "insurance contract" under Virginia law. Accordingly, the district court properly determined that the RPA is an insurance contract for the purposes of Virginia Code § 38.2–312.

D.

We note, as Minnieland does, that we are not the first to determine that the program marketed by Applied Underwriters, Inc. is insurance. In fact, several state insurance commissioners have determined that the EquityComp program and its sister program, SolutionOne, are not only subject to insurance regulations, but also violate those regulations. For example, the Vermont Department of Financial Regulation has barred Applied Underwriters, Inc. from selling the RPA in conjunction with guaranteed

---

159, 160 (Va. 1988) (listing "essential terms" of insurance contract as: "(1) the subject matter to be insured; (2) the risk insured against; (3) the commencement and period of the risk undertaken by the insurer; (4) the amount of insurance; and (5) the premium and time at which it is to be paid" (citation omitted)). AUCRA argues that, since the addition of the definition of "insurance" to the Virginia Code in 2001, this common law definition is no longer controlling. Opening Br. 32–33. The Virginia Supreme Court has not applied the common-law definition in connection with the statutory definition of "insurance." However, the common-law elements are essentially the same as the statutory requirements for every insurance policy. Therefore, an evaluation of the contract at issue under either the statutory factors or the common-law definition should yield the same result.

24

cost insurance policies in Vermont after concluding that the RPA "de facto operated as a retrospective rating plan, replacing [CNI's] guaranteed-cost workers' compensation insurance policy with an unfiled, unapproved retrospective rating plan." J.A. 233. Similarly, the Wisconsin Office of the Commissioner of Insurance entered into an agreement with ARS and CNI that they will "cease and desist from marketing, binding, issuing and renewing SolutionOne and EquityComp policies and any similarly designed policies and programs that involve side agreements that affect the terms of the workers' compensation policy, including but not limited to reinsurance agreements." J.A. 375. The California Insurance Commissioner likewise found that the EquityComp program and its RPA violate the California Insurance Code. *See* Decision and Order, *In the Matter of the Appeal of Shasta Linen Supply, Inc.*, No. AHB-WCA-14-31 (Dep't of Ins., State of Cal. June 20, 2016), http://www.insurance.ca.gov/0250-insurers/0500-legal-info/0600-decision-ruling/0100-precedential/upload/ShastaLinenSupplyInc.pdf.

Other courts faced with the RPA and similar related documents have also suggested that the program marketed by Applied Underwriters, including the RPA, is insurance. *See, e.g.*, *Nat'l Convention Servs.*, 239 F. Supp. 3d at 786 (observing that the RPA and guaranteed cost policies "plausibly serve the common purpose of providing workers' compensation insurance at rates that are affected by loss experience"); *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1116–17 (Cal. Ct. App. 2018) (determining that the RPA's provisions were meant to replace those of the insurance policies and that the Applied Underwriters affiliated entities were "so enmeshed" and "intertwined" that the RPA and insurance policies should be considered

25

together); *Citizens of Humanity, LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 909 N.W.2d 614, 632 (Neb.) (stating that "the RPA has the hallmarks of a retrospective rating plan" and concluding that the RPA is an "agreement concerning or relating to an insurance policy" under Nebraska law), *cert. denied*, 139 S. Ct. 274 (2018).

While each of these other jurisdictions has evaluated the RPA under different laws and for different purposes, the general consensus has consistently been that the RPA is subject to insurance regulations. We join that consensus in holding that the RPA at issue here is an insurance contract under Virginia law. Because arbitration provisions in insurance contracts are void under Virginia law, Va. Code § 38.2–312, AUCRA must face Minnieland's claims in court.

IV.

For these reasons, we affirm the judgment of the district court.

*AFFIRMED.*